UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

CATHY PENN IN HER CAPACITY AS     ]

GUARDIAN OF MATTHEW LALLI,        ]

    Plaintiff                    ]

v.                                ]

KNOX COUNTY, et al.,              ]

    Defendants                   ]


**DEPOSITION OF:  LIEUTENANT KATHY CARVER**


Taken before Cheryl C. Pieske, Registered Merit Reporter, Notary Public in and for the State of Maine, on **June 7, 2012,** at the Knox County Jail, Park Street, Rockland, Maine, commencing at 8:56 pursuant to notice given.

APPEARANCES:

FOR THE PLAINTIFF:          DANIEL J. STEVENS, ESQ.

                            RALPH I. LANCASTER, ESQ.

FOR THE DEFENDANT:          PETER T. MARCHESI, ESQ.

Also present:  Jennifer Stilkey, Dane Winslow, and Warren Heath, IV

```
 1        those.  Do you have the original?  I think that
 2        would be R9.  What I would like to know is if there
 3        are particular answers that you supplied information
 4        for, Lieutenant Carver?
 5   A.   I don't think there's anything particular.  The
 6        Major and I talked about each one of them, and I
 7        don't think he took any particular -- we just
 8        gathered -- you know, put our information together.
 9   Q.   And did you review the answers before he signed
10        them?
11   A.   No, sir, I did not.
12   Q.   So you didn't look at the final draft of the
13        answers?
14   A.   No.
15   Q.   Okay.  Have you ever been a party to a lawsuit
16        before?
17   A.   Yes, sir, I have.
18   Q.   And how many times?
19   A.   Three.
20   Q.   Okay.  And were you a plaintiff or a defendant or
21        both?  And, obviously, you can't be a plaintiff and
22        a defendant in the same case.
23   A.   Exactly.
24   Q.   Right.
25             MR. MARCHESI:  Actually, that's not
```

```
 1       technically true but...
 2  A.   I would say I must have been a defendant because
 3       it's in the same position.  It's similar.
 4  BY MR. STEVENS:
 5  Q.   Was it in your capacity --
 6  A.   Yes, sir.
 7  Q.   -- as administrator of the jail?
 8  A.   Yes, sir.
 9  Q.   Okay.  And when was the most recent time?
10  A.   Five years ago possibly.  Maybe five years ago.
11  Q.   And what kind of case was that?
12  A.   It was a case -- there was a claim of excessive use
13       of force in the jail and failure to protect against
14       that excessive use of force.
15  Q.   Okay.  And were you a lieutenant back then as well?
16  A.   Yes, I was.
17  Q.   How long have you been a lieutenant?
18  A.   I have been a lieutenant since 1993.
19  Q.   And when did you first start working for the Knox
20       County Jail?
21  A.   1989.
22  Q.   Okay.
23  A.   I'm one of the relics.
24  Q.   I was going to say, you probably have the longest --
25       one of the longer terms of service --
```

1      how she ended her life.  I can't remember whether it

2      was from an overdose or some other -- I honestly

3      can't remember the particulars on that.

4 Q.   But it was a complete suicide?  It wasn't an

5      attempt?  She actually killed herself --

6 A.   Yes, she did.

7 Q.   -- here at the jail?  And were you a witness to any

8      of those --

9 A.   No.

10 Q.   -- with regard to the one in 2003?

11 A.   No.

12 Q.   What are your duties at the jail as a lieutenant?

13 A.   I am the assistant jail administrator.  So I have a

14      multitude of tasks that can be assigned to me; but

15      on a daily routine, I ensure that the staffing

16      schedule is met, I review supervisory records, I

17      review logs.  I deal with personnel issues, inmate

18      discipline, officer discipline, training, budgetary

19      issues sometimes, and then the catch clause,

20      anything else that they want to put on my desk.

21 Q.   You wear many hats here at the jail, don't you?

22 A.   Yes, sir, I do.

23 Q.   With regard to -- one of your duties you told me was

24      the staffing of the -- for the jail.

25 A.   Yes.

```
 1      facility once a week, twice a week, whatever, and
 2      usually they'll set down with them and then go over
 3      it.  Sometimes they'll give me a separate roster or
 4      a note saying, yes, I have done this.  If they look
 5      at the tape, they're -- there's always a roster that
 6      they sign.
 7  Q.  Okay.  So this Lockup USA tape --
 8  A.  Uh-hmm.
 9  Q.  -- is that something you still have?
10  A.  Yes, sir.
11  Q.  That's a training device --
12  A.  Yes, sir.
13  Q.  -- that you use?  And if and when your officers
14      review that, there should be a note of that in their
15      training file?
16  A.  Uh-hmm.
17  Q.  Okay.  And you said sometimes if officers don't make
18      the -- a training session and they don't want to
19      look at the Lockup USA tape, then they might have
20      some informal --
21  A.  That's correct.
22  Q.  -- discussions with some of the counselors?
23  A.  And if the officer has been at the academy within a
24      year's period, they've already had their suicide
25      training for that year, because that is an area that
```

1      they cover at the Criminal Justice Academy.

2 Q.   Okay.  Well, let's talk about those two things.  One

3     is if there are individual training sessions between

4     your officers and ARCH, there would be a note in

5     their personnel file to that effect?

6 A.   There should be.

7 Q.   Okay.

8 A.   And I stress should be.

9 Q.   And you also said that if they -- I think you said

10    if they attended the academy within the past year?

11 A.   That is correct.

12 Q.   And under what circumstances would a corrections

13    officer go -- is that for new hires, new people, or

14    do people go back to the academy?

15 A.   No, that's for relatively new.  They have been hired

16    full-time within the past year.  We have one year to

17    send them to the academy for their -- to get

18    certified --

19 Q.   Okay.

20 A.   -- once they have been hired.

21 Q.   And what do you do for new employees that have not

22    yet been to the academy?  When do they get their

23    suicide training?

24 A.   Usually in their initial orientation, I use the

25    Lockup USA tape, have them watch that, review it,

1       ask questions; and during their orientation, I use

2       senior officers, supervisors, to deal and give them

3       the information on special management, which

4       includes suicide individuals.

5   Q.  Okay.

6   A.  And they're always welcome to come to any of the

7       training.  They're encouraged to come.  They're not

8       mandated, but they are encouraged to come to any

9       training that is available.

10  Q.  Okay.  Have you had a chance to look at Mr. Leach's

11      report?

12  A.  I have briefly looked through it, yes.

13  Q.  Okay.  And if you want to flip to S2, it is found --

14          **MR. MARCHESI:**  This is the one that I

15      stipulated was admissible.

16          **MR. STEVENS:**  Yes.  I think that's right.

17  **BY MR. STEVENS:**

18  Q.  If you can flip to page 49, Lieutenant Carver.

19          **MR. MARCHESI:**  Did you say --

20  Q.  Page 9.  Excuse me, page 9, not 49?

21          **MR. MARCHESI:**  Okay.

22  **BY MR. STEVENS:**

23  Q.  I misspoke.  Item 65, item 65 through 81 on the next

24      page, they detail training rosters for suicide

25      prevention.  Do you see that?

```
 1        and you told me not to use one.
 2                    (Off the record colloquy.)
 3               MR. MARCHESI:  We were at C4.  What time?
 4               MR. STEVENS:  It would be page 5, 15 -- see
 5        the 1529 entry?
 6               MR. MARCHESI:  Not page 5.
 7               MR. STEVENS:  Maybe you're looking at a
 8        different version.  This is the intake/release for
 9        October 5th.
10               MR. MARCHESI:  Okay.
11  BY MR. STEVENS:
12  Q.   And do you see an entry in the intake and release
13        that would reflect that Matt was found hanging at
14        1529?
15  A.   Yes, sir.
16  Q.   Okay.  So that's not quite an hour after he got back
17        from court?
18  A.   That is correct.
19  Q.   Okay.  Now, you were telling me, I think, Lieutenant
20        Carver, that your first memory of that day, the 5th,
21        was you had some conversation with Corporal Woll?
22  A.   Yes, I did.
23  Q.   Okay.  And where was that interaction?
24  A.   In the booking area.
25  Q.   Okay.  And what do you remember about that
```

1      interaction?

2  A.   He just advised me that they were going to be

3       putting one of the inmates into the smock, moving

4       one out of the 124 cell, and moving this other

5       individual in.

6                    (Off the record colloquy.)

7  **BY MR. STEVENS:**

8  Q.   Corporal Woll told you that they were going to be

9       putting one of the inmates in a smock?

10 A.   Correct.

11 Q.   And who was that?

12 A.   That was Matthew Lalli.

13 Q.   Did he use Lalli by name?

14 A.   I believe he did, yes.

15 Q.   All right.  And what else did he say he was going to

16      do?

17 A.   They were going to be moving the individual that was

18      in the 124 out to be able to put Mr. Lalli into 124.

19 Q.   Okay.  Do you remember who was in 124?

20 A.   I don't without looking.

21 Q.   Was that someone who was under a suicide watch?

22 A.   I don't know without looking, sir.  I --

23 Q.   Within the -- you may want to look at L1 or L2.  L2,

24      perhaps.  It's a blow-up of L1.  L2 is a diagram of

25      the holding/intake area?

1  A.    I believe so, yes.

2  Q.    And you've -- you have been here a number of years.

3        I think you said probably one of the longest

4        serving --

5  A.    Dinosaurs.

6  Q.    I didn't say that, Lieutenant.  From the intake

7        area, would you have a view down into Cell 135?

8  A.    Not particularly into the cell.  You could see the

9        dayroom area from -- if you're standing by the door

10       or possibly in front of the desk, it looks directly

11       down the hallway.  So you can see the dayroom --

12       what we call the dayroom area of that section.

13 Q.    Okay.  So you could see from the intake area

14       without -- well, just from the intake room, you

15       could see the dayroom that would connect to Cell

16       135 --

17 A.    Correct.

18 Q.    -- but you couldn't actually see what was going on

19       in 135?

20 A.    That's correct.

21 Q.    And to see what's going on in Cell 135, you have to

22       get up and walk down the hallway?

23 A.    Right.

24 Q.    And do you have to actually go into the dayroom to

25       look into 135, or can you stand even outside the

179

SIGNATURE PAGE

TO BE COMPLETED BY DEPONENT:

    I, **KATHY CARVER,** have read or had read to me the foregoing pages of my deposition and have noted any errors in form or substance of my testimony, together with their respective corrections and the reasons therefor on the following errata page.

(Signature) _Kathy Carver_

(Date) _7/27/12_

    Name of person reading transcript to deponent if deponent cannot read:

_____

    *    *    *    *    *    *

TO BE COMPLETED BY NOTARY PUBLIC OR ATTORNEY:
    I, _HEIDI S NORWEG_, a Notary Public/~~Attorney,~~ hereby acknowledge that the above-named deponent personally appeared before me and affixed his/her signature above as his/her own true act and deed.

_Heidi S Norweg_

DATED _7/27/12_

My Commission Expires: _3/30/2013_

Title: Penn v. Knox County, et als.
Jurisdiction: USDC – District of Maine
Date of deposition: June 7, 2012
Errata return deadline: July 29, 2012
Noticing party: Daniel Stevens, Esq.
Reporter: CCP

——PIESKE REPORTING SERVICE   1-800-698-1666——

ERRATA

Deponent's Name:   **LIEUTENTANT KATHY CARVER**

|  |  | CHANGE |  | CHANGE |  |  |
|---|---|---|---|---|---|---|
| PAGE | *LINE* | FROM | * | TO | * | REASON |

| 46 Line 5A | Medical | Booking | Medical files are not in Jms. |
| 125 Line 24 | Hallway | Holloway | — misspelled |
| 170 Line 101 | I did | I did not | Stated No |