## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| CATHY PENN, in her capacity as guardian of Matthew Lalli, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | Civil No. 2:11-cv-00363-NT |
| KNOX COUNTY, et. al., | ) ) ) | |
| Defendants. | ) ) | |

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Before the Court is the Defendants' Motion for Summary Judgment, ECF No. 89, on all counts of the First Amended Complaint. The Plaintiff's son Matthew Lalli was injured when he attempted suicide while in custody at the Knox County Jail. Cathy Penn, in her capacity as guardian of Mathew Lalli, has sued the following Defendants: Knox County; Knox County Jail; Knox County Sheriff's Department; John Hinkley, in his capacity as administrator of the Knox County Jail; Kathy Carver, in her capacity as assistant administrator of the Knox County Jail; Donna Dennison, in her capacity as Knox County Sheriff (together, the "**Municipal Defendants**"); and corrections officers Angela Escorsio, Warren Heath III, Warren Heath IV, Julie Stilkey, Christopher Truppa, Dane Winslow, Bradley Woll, and Robert Wood. Penn seeks money damages under 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution and under state law. The Defendants claim that the Plaintiff cannot prove that Mr. Lalli's injuries were a result of any deliberate indifference on their part and that the Maine Tort

Claims Act bars all of the Plaintiff's state law claims. For the reasons that follow, the Court **GRANTS** the Defendants' motion in part and **DENIES** the motion in part.

## FACTUAL BACKGROUND

The following facts are either undisputed or construed in the light most favorable to the Plaintiff. *See Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007).

On Saturday, October 3, 2009, Matthew Lalli, a 22-year-old single father and landscaper, was arrested for allegedly being intoxicated and for committing assault in violation of the terms of his release. Pl.'s Resp. to Defs.' Statement of Material Facts ¶¶ 79-80, ECF No. 93 ("**PRDSMF**"); Defs.' Reply to Pl.'s Statement of Additional Material Facts ¶¶ 321-323, ECF No. 101 ("**DRPSAMF**"). That evening, he was transported to Knox County Jail.  PRDSMF ¶ 79. Lalli's arraignment on these charges was set for Monday, October 5, 2009, and he was to be held at the jail until that time, after which a judge would determine whether to release him on bail or hold him in jail pending the resolution of his case. *See* PRDSMF ¶¶ 122, 170; DRPSAMF ¶¶ 361, 384-85.

Lalli's mental health was tenuous. *See* DRPSAMF ¶¶ 323A-324.  He had struggled with mental health and substance abuse problems for years. *Id.* Just weeks earlier, in September, he was involuntarily committed to a psychiatric ward. *Id.* at ¶ 325. He and his three-year-old daughter lived with his mother, Cathy Penn. *Id.* at ¶ 323.

**Saturday, October 3, 2009: Lalli's Intake at the jail**

When Lalli arrived at the jail, Sergeant Winslow[1] was on duty as the jail's shift supervisor and Corrections Officer Stilkey was staffing the jail's intake desk. PRDSMF ¶¶ 81, 88. Sergeant Winslow and Officer Stilkey began processing Lalli at around 7:20 p.m. DRPSAMF ¶ 320. Sergeant Winslow met Lalli in the jail's sallyport, escorted him into the jail's intake area, and completed paperwork documenting Lalli's arrival. [2]  PRDSMF ¶ 82. Once Lalli was inside, Officer Stilkey

---

[1]     For the sake of clarity, the Court refers to jail personnel by both their names and ranks. In October 2009, Winslow's rank at the Knox County Jail was Sergeant, though he was later demoted to Corrections Officer. PRDSMF ¶ 81; DRPSAMF ¶ 336. As Winslow was a Sergeant at the time the litigated events took place, the Court refers to him as Sergeant Winslow in this opinion.

[2]     The Defendants cite to certain facts supported only by Sergeant Winslow's testimony. For instance, only Sergeant Winslow testified that: (1) Lalli's arresting officer told Sergeant Winslow that he did not believe Lalli was suicidal; and (2) just after Lalli arrived at the jail, he told Sergeant Winslow that he was not considering killing himself. PRDSMF ¶¶ 83-86.

The Plaintiff contends that the Court should disregard Sergeant Winslow's self-interested deposition testimony for purposes of summary judgment because the Plaintiff disputes it and it is not corroborated by other record evidence. In support of her argument, the Plaintiff points to two pieces of impeachment evidence: (1) an internal Knox County Jail document demonstrating that Sergeant Winslow was disciplined in 2001 for falsifying log entries to show that he had conducted inmate checks which he had not conducted; and (2) Sheriff Dennison's deposition testimony that Sergeant Winslow was demoted in 2010 for lying to jail investigators. DRPSAMF ¶ 336. The Defendants respond, first, that the Plaintiff's impeachment evidence is inadmissible under Federal Rule of 608(b), and, second, that the Plaintiff cannot create a genuine dispute of material fact merely by calling Sergeant Winslow's credibility into doubt.

Rule 608(b) does prohibit a party from attacking a witness's credibility by entering extrinsic evidence of a specific instance of conduct against the witness, but it also empowers a party to attack a witness's credibility by asking the witness about specific instances of conduct on cross-examination, so long as those instances are "probative" of the witness's "character for truthfulness or untruthfulness." Fed.R.Evid. 608(b). While the 2001 jail document and Sheriff Dennison's testimony about Sergeant Winslow's 2010 demotion may both be inadmissible as "extrinsic evidence," the Plaintiff is permitted to ask Sergeant Winslow about both incidents on cross examination, as each is highly probative of Sergeant Winslow's character for untruthfulness. "[I]f the credibility of the movant's witnesses is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied and the case allowed to proceed to trial." *E.E.O.C. v. Union Independiente de la Autoridad de Aceuductos y Alcantarillados de P.R.*, 279 F.3d 49, 56 (1st Cir. 2002) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2726, at 446 (3d ed. 1998) (internal quotation marks omitted).

Viewing the two incidents together, a jury might well decide Sergeant Winslow is an unreliable narrator and decline to give his testimony any weight. As the Court must draw all

assumed responsibility for booking and processing him. PRDSMF ¶ 88. In accordance with the jail's standard procedures, Officer Stilkey filled out both a suicide risk assessment form and a medical screening form for Lalli, asking him questions prompted by the forms and recording his answers. PRDSMF ¶¶ 89, 92A.

The suicide risk assessment form has a short message at the top of the first page instructing that "if the response given by the inmate is not a definite 'Yes' or 'No' the answer defaults to a 'Yes' answer." DRPSAMF ¶ 330; Suicide Risk Assessment 1. Defs.' Exh. 2 at 1-3, ECF No. 88-17 ("**Suicide Risk Assessment**").

Pertinent questions and Lalli's answers, as Officer Stilkey memorialized them, are as follows:[3]

> 2.) WITHIN THE LAST SIX MONTHS HAVE YOU LOST A JOB, RELATIONSHIP, OR HAD A FAMILY MEMBER OR CLOSE FRIEND DIE?
>
> Lost a relationship
>
> .   .   .
>
> 4.) ARE YOUR FAMILY AND/OR FRIENDS ASHAMED BY WHAT HAS HAPPENED TO YOU AS A RESULT OF THIS ARREST?
>
> yes
>
> 5.) ARE YOU CURRENTLY CONNECTED, OR HAVE YOU EVER BEEN CONNECTED, WITH A COUNSELOR, CASEWORKER, OR OTHER AGENCY FOR PSYCHIATRIC, SUBSTANCE ABUSE, OR SOCIAL SUPPORT (specify current providers)?
>
> yes mid coast mental health for social support

---

reasonable inferences in the Plaintiff's favor, it must assign no weight to Sergeant Winslow's deposition testimony where it is disputed and uncorroborated.

[3]    The original punctuation, spelling, and capitalization from both the form and Officer Stilkey's answers is preserved in all the reproduced excerpts below.

6.) HAVE YOU EVER BEEN ADMITTED TO A HOSPITAL FOR PSYCHIATRIC OR EMOTIONAL REASONS?

yes Park Unit two week ago

.   .   .

9.) HAS ANYONE IN YOUR FAMILY, OR A CLOSE FRIEND, ATTEMPTED OR COMMITTED SUICIDE?  (spouse, parent, friend, lover, other)

2 close friends committed suicide 3 years ago

10.)  HAVE YOU EVER ATTEMPTED SUICIDE? (If yes, When?)

2 years ago ran into legde 70 miles Per hr

11.) HAVE YOU EVER CONSIDERED SUICIDE? (If yes, When?)

yes 1 week ago

12.) ARE YOU CURRENTLY FEELING LIKE KILLING YOURSELF?

not sure feels that his life is over

.   .   .

14.) DO YOU HAVE THINGS TO LOOK FORWARD TO IN THE NEAR FUTURE?

yes has a daughter 3 yrs old

PRDSMF ¶ 90; DRPSAMF ¶ 328; Defs.' Exh. 2 at 1-3, No. 88-17 ("**Suicide Risk Assessment**").[4]

---

[4]     A model suicide risk assessment form contained within the jail's training materials uses a similar series of yes/no questions and assigns weight to the answers on a 42-point scale to determine the level of supervision an inmate requires. DRPSAMF ¶ 313; Pl.'s Exh. JJ, ECF No. 94-9. Under the scale, a score of 15 or more points requires the Jail to provide one-on-one observation of the inmate and to conduct a mental health evaluation within one hour. Pl.'s Exh. JJ. When Lalli's answers are applied to this form, his risk of suicide rates at 20 points. *See* Pl.'s Exh. JJ; DRPSAMF ¶ 328.

Next, Officer Stilkey documented her own observations of Lalli on the form. The following excerpt shows questions from the form and Officer Stilkey's answers:

> 15.) DOES THE ARRESTING OR TRANSPORTING OFFICER BELIEVE THAT THE INMATE IS CURRENTLY A SUICIDAL RISK?
>
> is very depressed I don't think he would if he talks to someone I think he'd be ok
>
> .   .   .
>
> 18.) INDIVIDUAL SHOWS SIGNS OF DEPRESSION, ANXIETY, FEAR, ANGER, EMBARASSMENT OR SHAME (crying, flat emotions, pacing, yelling, etc)
>
> yes very upset he disappointed his daughter
>
> 19.) INDIVIDUAL IS ACTING STRANGE (hearing or seeing things not there, disoriented, unable to focus, unintelligible or confused speech)
>
> unable to focus for very long

DRPSAMF   ¶ 329;   PRDSMF   ¶ 92A;   DRPSAMF   ¶ 329.   Suicide   Risk Assessment 3.

Next, the form provides somewhat ambiguous instructions about what actions the jail should take in response to the detainee's answers and the officer's observations:

> If the questions above are answered in the following manner:
>
> A: Yes to question 12, 13 AND/OR:
>
> B: Yes to (3) or more questions on the suicide assessment[5]

---

[5]   The form itself is logically inconsistent.  Presumably a "yes" response to the question asking whether the inmate has things to look forward to would lower the risk of suicide. It is clear however,

> THE INMATE WILL BE PLACED ON "OBSERVATION" STATUS, SHIFT SUPERVISOR IS TO BE NOTIFIED AND REVIEW THIS QUESTIONNAIRE, UPON DOING SO HE/SHE WILL MAKE THE FINAL DECISION ACCORDING TO POLICY OF ACTION TO TAKE.
>
> IF ARCH MENTAL HEALTH[6] IS ON DUTY, THEY WILL BE NOTIFIED OF SITUATION.
>
> IF ARCH MENTAL HEALTH IS OFF DUTY, (MCMH) CRISIS WILL BE REQUESTED

Suicide Risk Assessment 4.

A final portion of the form calls for the booking officer to indicate with checkmarks which of five levels of intervention the detainee received. Common jail practice dictated that it was the shift supervisor's responsibility to fill out this section:

☐ NO INTERVENTION / GENERAL POPULATION

☐ BAILED / RELEASED

☐ PLACED ON WELFARE WATCH

☐ PLACED ON SUICIDE WATCH STEP 1

☐ PLACED ON SUICIDE WATCH STEP 2

DRPSAMF ¶ 331; Suicide Risk Assessment 4-5. Neither Officer Stilkey, the booking officer, nor Sergeant Winslow, the shift supervisor, checked off any of the boxes.

---

that Lalli responded "yes" to well more than three questions where a "yes" answer would indicate a higher risk of suicide.

[6] In October of 2009, the Jail had a contract with Allied Resources for Correctional Health (ARCH) to provide certain mental health services. PRDSMF ¶ 73; DRPSAMF ¶ 285. Under the contract, ARCH was required to provide a licensed social worker (an LSC) two days a week, for five hours a day, and a licensed clinical professional counselor (an LCPC) for one day a week, also for five hours. DRPSAMF ¶ 285. While on the premises, the LSC and the LCPC visited inmates only if jail officials requested they do so or if jail officials placed an inmate on welfare or suicide watch. PRDSMF ¶ 102-03; DRPSAMF ¶ 287. Jail officials were instructed to call Mid-Coast Mental Health (MCMH) if they encountered a mental health emergency when ARCH personnel were not on site. PRDSMF ¶ 75; DRPSAMF ¶ 288.

This form is signed and dated October 3, 2009, at 8:48 p.m., next to a line for the shift supervisor's signature.  Suicide Risk Assessment 5.

Officer Stilkey then moved on to the next phase of the intake process: completing the jail's inmate medical assessment form. DRPSAMF ¶ 332. During this step, Lalli told Officer Stilkey that he suffered from attention deficit hyperactivity disorder, obsessive compulsive disorder, depression, major anxiety disorder, and alcoholism and that he was using Oxycodone and Adderall. DRPSAMF ¶ 333. He also again informed her that he had attempted suicide once before. DRPSAMF ¶ 333.

Lalli's suicide risk assessment and medical assessment worried Officer Stilkey. DRPSAMF ¶ 334. As a result, after completing the forms, Officer Stilkey called Sergeant Winslow, who was in another part of the jail. PRDSMF ¶ 93; DRPSAMF ¶ 334. "[Y]ou need to look at this," Officer Stilkey told him. DRPSAMF ¶ 334.

Shortly afterwards, Sergeant Winslow came down to the intake area and reviewed the intake screening forms, reading each of the questions and answers. PRDSMF ¶ 94. He decided to place Lalli on "welfare watch," which required staff to make separate log entries regarding Lalli's condition when they conducted their regular fifteen-minute checks of his cell and ensured that a mental health care worker would speak with Lalli the next time one was scheduled to visit the jail. PRDSMF ¶¶ 100-103; DRPSAMF ¶¶ 337, 339-340. No mental health care worker visited the jail's premises until Tuesday, October 6th, three days later. DRPSAMF ¶

8

340. Sergeant Winslow also decided to move Lalli into Cell 135. PRDSMF ¶¶ 101, 105.

To understand the significance of the placement in Cell 135, some description of the jail's physical layout is necessary. The inmate entrance leads into a hallway, which opens up into the jail's intake area, a room ringed by several jail cells. Stevens Decl. Exh. BB, ECF No. 94-1 ("**Jail Floor Plan**"). Within the intake area is an intake desk that faces Cells 111 and 112, the holding cells where new or returning inmates are housed, often two or more to a room, pending processing. DRPSAMF ¶ 268; Jail Floor Plan. Past the intake desk and opposite the hallway leading from the jail's entrance is a cluster of several more cells, including the jail's two suicide-prevention cells, Cells 124 and 127.   DRPSAMF ¶¶ 271-72, 274; Jail Floor Plan. Unlike a regular cell, these cells are stripped of objects a detainee could use to harm himself. DRPSAMF ¶¶ 270-71. Cell 124 is the larger of the two suicide-prevention cells, and the only one that officers can observe directly from the intake desk. DRPSAMF ¶¶ 271-72, 274-75. Additionally, the jail stores a "suicide smock," a garment used to restrain detainees at risk of harming themselves, near the intake desk. DRPSAMF ¶ 296A.

Behind the intake area are several more cells, including three cells which share a common day room: Cells 134, 135 and 136. PRDSMF ¶ 101A; DRPSAMF ¶ 277; Jail Floor Plan. Officers sitting at the intake desk can hear people in these cells if they make a loud noise, but they have only a partial view into the day room adjoining these cells and they have no view into Cell 135 itself. PRDSMF ¶¶ 208,

9

218; DRPSAMF ¶¶ 279-80. Finally, Cell 135 is not stripped of objects a detainee could use to harm himself. DRPSAMF ¶¶ 403A, 405. For instance, it contains sheets and bedding which a detainee could potentially fashion into a makeshift noose. PRDSMF ¶ 224-26; DRPSAMF ¶¶ 403A, 405.

Lalli was first moved into Cell 135 at some point after 8:05 p.m. PRDSMF ¶ 92A. Thereafter, according to entries in the jail's welfare watch log, Officer Stilkey checked on Lalli every fifteen minutes from 8:30 p.m. until 12:15 a.m., except for two intervals where another corrections officer performed the checks.[7] PRDSMF ¶¶ 105-06; Defs.' Exh. 2 at 1-2, ECF No. 88-18 ("**Welfare Watch Log**"). Officer Stilkey's log entries indicate that, in each instance, Lalli was simply sleeping on his bed when she checked on him, posing no apparent threat to himself. PRDSMF ¶ 106.

### Sunday, October 4, 2009

At 12:15 a.m. on October 4, 2009, Officer Stilkey was relieved of her post in the intake wing and transferred to another area of the jail. PRDSMF ¶ 105. Both Officer Stilkey and Sergeant Winslow went off duty almost six hours later, at 6:00 a.m., and neither had any further contact with Lalli. PRDSMF ¶ 107.

---

[7]    The Plaintiff argues that a reasonable jury could conclude that all or some of these checks did not actually occur, pointing to various pieces of evidence which suggest that the jail's log books are unreliable. PRDSMF ¶¶ 105-07; DRPSAMF ¶ 341. This argument falls short. While there is some evidence that some corrections officers at the jail falsified log entries over the decade preceding Lalli's injuries, *see* DRPSAMF ¶ 341, the Plaintiff provided no evidence that Officer Stilkey was responsible for falsifying log entries or that Officer Stilkey had a character for untruthfulness. *Cf.* *supra* note 2 (discussing Sergeant Winslow falsification of log entries and character for untruthfulness). Accordingly, Officer Stilkey's testimony that she performed regular checks on Lalli on the evening of October 3rd and entered them into the Welfare Watch Log remains uncontroverted and is fairly considered on summary judgment. PRDSMF ¶ 105.

Corrections Officer Warren Heath IV came on duty as the jail's intake officer at 12:25 p.m. that afternoon. PRDSMF ¶ 108. Officer Heath IV observed Lalli and made entries about his condition approximately every fifteen minutes from 12:30 p.m. until 5:45 p.m. PRDSMF ¶ 108-09. For each of these entries, Officer Heath IV simply wrote that Lalli was "all set." PRDSMF ¶ 110.

**Monday Morning -- October 5, 2009**

The following morning, at approximately 6:00 a.m., Officer Heath IV again assumed post as the jail's intake officer. PRDSMF ¶ 116. Just before 7:00 a.m., Officer Heath IV had a troubling encounter with Lalli, which he later documented in the jail's intake/release log: "while moving inmate Wood, inmate Matthew Lalli told me that he has sole custody of his daughter and that if he were not allowed to be on the outside then it would be better if he wasn't alive at all." PRDSMF ¶ 118. Officer Heath IV made a separate entry about the encounter in the Welfare Watch Log: "Lalli told me he was not doing well and losing his mind." PRDSMF ¶ 119. Concerned, Officer Heath IV decided to call the shift supervisor on duty, Corporal Bradley Woll, to let him know about Lalli's comments. PRDSMF ¶ 123; DRPSAMF ¶ 346.

After speaking with Officer Heath IV, Corporal Woll decided that he needed to speak personally with Lalli to determine whether to "bump him up" to a higher watch level. DRPSAMF ¶¶ 346-47. Corporal Woll told Officer Heath IV to keep an eye on Lalli until he could get down to Lalli's cell to evaluate him personally. PRDSMF ¶ 124.

About an hour later, Corporal Woll spoke with Lalli for about five to ten minutes. PRDSMF ¶¶ 118, 126-29; DRPSAMF ¶ 348. During their conversation, Corporal Woll noticed that Lalli was getting anxious about his upcoming arraignment. DRPSAMF ¶ 349. Corporal Woll asked Lalli if he had anything to look forward to; Lalli responded that he had his daughter. PRDSMF ¶ 132. When Corporal Woll asked Lalli if he needed to see a mental health care worker, Lalli replied that he would be okay as long as he was released and was able to see his child. PRDSMF ¶¶ 133-34. Corporal Woll concluded that Lalli would be safe as long as he was released, but that there could be a problem if Lalli was held. PRDSMF ¶ 136; DRPSAMF ¶ 350. Corporal Woll made a mental note to review Lalli's situation that afternoon. DRPSAMF ¶ 351.

Between 8:00 a.m. and 12 p.m., the Welfare Watch Log reflects that Officer Heath IV checked in on Lalli every fifteen minutes, noting at each visit that Lalli was "all set." PRDSMF ¶ 146. At 12:07 p.m., the jail's intake/release log indicates that Corrections Officer Angela Escorsio took over from Officer Heath IV as intake officer. DRPSAMF ¶ 358. As Officer Escorsio arrived to take over the post, Officer Heath IV told her that Lalli had been upset that morning and that he was on welfare watch. DRPSAMF ¶ 359. Corporal Woll also spoke with Officer Escorsio about Lalli's interactions with Officer Heath IV and instructed Officer Escorsio to keep an eye on Lalli.  DRPSAMF ¶ 360.

**October 5, 2009 -- Transport to the Arraignment**

Between noon and 12:30 p.m., jail staff assembled nine detainees, six men and three women, in the intake area to prepare them for their trip to the Knox County District Court for court appearances. DRPSAMF ¶ 361. The group included Lalli and several other inmates who have been deposed in relation to this suit. DRPSAMF ¶¶ 363, 375-76, 379, 382.

Correction Officers Warren Heath III, Christopher Truppa, and Robert Wood served as the jail's transport officers, charged with driving the nine detainees to and from the Knox County District Court, a mile-and-a-half trip that takes from two to four minutes. PRDSMF ¶¶ 150, 158. Shortly after noon, the transport officers drove two vans into the jail's sallyport and joined Officer Escorsio in the intake area. PRDSMF ¶ 153. One inmate testified that at some point after the transport officers entered the jail's intake area but before they loaded the inmates onto the vans, Lalli began "really freaking out," saying "I need my medication or I need to get the hell out of here" and "I have got a newborn kid and I need to get out of here," loud enough for the corrections officers in the room to hear. DRPSAMF ¶ 364. According to the inmate, at least two corrections officers in the intake area told Lalli to "settle down" and to "calm down." DRPSAMF ¶ 364.

The transport officers placed the inmates into restraints and then moved the six men into one van and the three women into another. PRDSMF ¶ 158B. Officer Wood drove the men while Officers Truppa and Heath III drove the women. PRDSMF ¶¶ 156-158B. The men's van has a partition between the cab and the

passenger compartment. PRDSMF ¶ 155. Jail officials typically leave the partition's slider window open to make it easy to communicate with the inmates. DRPSAMF ¶ 367. According to one inmate present, Lalli made various threats to hurt himself during the trip from the jail to the courthouse, saying "I need my medication" and "if I don't get the hell out of here I'm going to hurt myself, kill myself." DRPSAMF ¶ 366.

### October 5, 2009 -- The Arraignment

Once the vans arrived at the courthouse, the three transport officers escorted the inmates into the courtroom, seating them in its dock area. PRDSMF ¶ 159. The dock area has two rows of benches facing the well of the court, perpendicular to both the judge's bench and the attorneys' tables. PRDSMF ¶ 159; DRPSAMF ¶ 368; Pl's Exh. RR, ECF No. 94-17 (sketch of the courtroom's layout). Officers Truppa and Heath III sat with the inmates, and Jeremy Pratt, Lalli's attorney, sat at the table closest to them. PRDSMF ¶ 160; DRPSAMF ¶¶ 369-370. Meanwhile, Assistant District Attorney Lindsay Jones sat at the table furthest from the inmates and Officer Wood stood near her side. PRDSMF ¶ 160; DRPSAMF ¶¶ 369-70.

At one point before the judge took the bench, Attorney Pratt spoke with Lalli about his case. DRPSAMF ¶ 372. The conversation grew animated enough that ADA Jones and Officer Wood could hear parts of it from where they were situated, roughly twenty feet away. PRDSMF ¶ 162; DRPSAMF ¶ 372. Officer Wood testified that he heard Lalli say "it's over," but was not able to hear the rest of the conversation. DRPSAMF ¶¶ 162-64. ADA Jones testified that Lalli told his attorney

that "if he was not allowed to bail out . . . then he didn't have anything to live for." DRPSAMF ¶ 372. As Officer Wood recalled, he then turned to ADA Jones and said "if he continues to make a comment like that he may find himself going back to jail and being put in a turtle suit."[8] PRDSMF ¶ 165. ADA Jones also recalled Officer Wood making a similar comment. DRPSAMF ¶ 373.  Numerous inmates testified that Lalli made repeated and loud statements before and after the arraignment that he wanted to kill himself and would kill himself if he were not released on bail. DRPSAMF ¶¶ 377-383.

During this time, Officers Truppa and Heath III remained in the docking area with the other inmates. PRDSMF ¶¶ 160-61. As Officer Heath III recalled, Lalli was upset, arguing and pleading with the judge to release him because he had a sole custody of a young child and needed to care for her. PRDSMF ¶ 169. He also testified that Lalli got more and more agitated as the exchange with the judge went on, commenting that "it would be all be over" and that he would "just end it" if his bail were denied. PRDSMF ¶ 169. Officer Truppa remembered the events similarly, testifying that Lalli made comments to the judge along the lines of "this is no good," "I have to get out, and "this is going to wreck my life." PRDSMF ¶¶ 170-71. By contrast, the record is not entirely clear as to which parts of this exchange Officer Wood witnessed. Once the judge entered the courtroom, Officer Wood was in and out of the courtroom, bringing paperwork back and forth from the clerk's window. PRDSMF ¶¶ 167-68, 172, 178.

---

[8]     As the Plaintiff explains, "'turtle suit' is a slang term for a smock given to inmates who are at risk of attempting suicide." Elsewhere, the parties refer to such a suit as a "suicide smock," which is the term the court adopts. *See* DRPSAMF ¶ 296A.

Ultimately, the judge ordered that Lalli be held without bail. PRDSMF ¶ 177. After the judge issued the ruling, Lalli became upset and started crying. DRPSAMF ¶ 384. As Lalli returned to the dock area, one witness testified, he was "screaming hysterically and crying and threatening suicide." DRPSAMF ¶ 385. This witness recalled that after Lalli rejoined the other inmates, he said that he "might as well just kill himself because he [couldn't] go back to jail" and that he was "going to lose everything." DRPSAMF ¶ 386.

### October 5, 2009 -- Lalli's Transport Back to Jail

Next, the transport officers escorted the inmates out of the courthouse to the jail's vans. DRPSAMF ¶ 387. Lalli cried during the walk outside. DRPSAMF ¶ 387. On the drive back to the jail, Lalli sat in front row of the van's passenger compartment, closest to Officer Wood, who was again driving. DRPSAMF ¶ 388. Another inmate in the van testified that Lalli "kept saying he was going to kill himself" throughout the short trip and that Lalli spoke loudly. DRPSAMF ¶¶ 389-90.

The vans returned to the jail at about 2:35 p.m. and Officers Wood, Truppa, and Heath III escorted the other inmates into the intake area. PRDSMF ¶ 188; DRPSAMF ¶ 391. Inside, Officer Escorsio and Corporal Woll remained on duty. PRDSMF ¶¶ 117, 193-95; DRPSAMF ¶¶ 392-93. Both were stationed in the intake area to carry out administrative details related to the detainees' return from court. DRPSAMF ¶¶ 392-93, PRDSMF ¶¶ 196, 197.

### October 5, 2009 -- Lalli's Reprocessing into the Jail

When Lalli arrived in intake, he began "kicking" and "slamming around" the area. DRPSAMF ¶ 394. As Lalli waited for jail officials to unshackle him and return him to his cell, he made a number of loud threats to kill himself. DRPSAMF ¶ 396. One inmate, who was housed at some distance in Cell 136, recalled that Lalli was hollering, "I can't take this, I can't be here, . . . I feel like killing myself." DRPSAMF ¶ 398.

The record is somewhat murky regarding whether anyone back at the jail learned that Lalli had been making suicidal threats at the courthouse. While none of the transport officers relayed this information to Corporal Woll or Officer Escorsio, it is probable that one of the inmates did inform Escorsio. PRDSMF ¶¶ 189-91, 231, 233; DRPSAMF ¶ 399.

After removing the returning inmates' restraints, Officers Wood, Truppa, and Heath III left the intake area, drove the two vans out of the sallyport area, and went upstairs to take care of other duties. PRDSMF ¶¶ 190-91. The record suggests the transport officers took no other action related to Lalli after returning to the jail. PRDSMF ¶¶ 190-91.

At approximately 2:52 p.m., a corrections officer strip-searched Lalli. PRDSMF ¶ 200. Lalli was upset after the search and began to cry. PRDSMF ¶ 201; DRPSAMF ¶ 400. Hoping to calm Lalli down, Officer Escorsio allowed him to make a call from the phone next to the jail's intake desk. PRDSMF ¶ 201; DRPSAMF ¶ 400. As the call began, Officer Escorsio heard Lalli speak about his daughter and

the denial of his bail. PRDSMF ¶ 201. Corporal Woll, who was also nearby, heard Lalli say that he would rather die if he did not have his daughter. PRDSMF ¶ 206.

Corporal Woll was "worried" by what Lalli said during the call. DRPSAMF ¶ 401. Lieutenant Kathy Carver, the jail's assistant administrator, happened to be in the intake area at the time. PRDSMF ¶¶ 57, 207. She looked at Corporal Woll and told him he needed to place Lalli "on a watch." PRDSMF ¶¶ 57, 207; DRPSAMF ¶ 402. Corporal Woll replied that he was going to place Lalli on a suicide watch in Cell 124, one of the intake area's suicide prevention cells, and that he was going to restrain Lalli in a suicide smock. DRPSAMF ¶¶ 271, 402. Corporal Woll told Lieutenant Carver that "he would have Lalli on that watch" "as soon as he got the intake area cleaned up." PRDSMF ¶ 207. Corporal Woll told Officer Escorsio about his plan. PRDSMF ¶ 208. Officer Escorsio told Corporal Woll she also thought Lalli should be moved from Cell 135 to a cell where he would be safe and where she could talk to him. PRDSMF ¶ 209.

However, Cell 124 was currently occupied by another male detainee. PRDSMF ¶ 211.  Though the jail's other suicide prevention cell, Cell 127, was vacant, it shares a day room with Cell 126, which was occupied by a female detainee. PRDSMF ¶ 212. Accordingly, to make room for Lalli, Corporal Woll planned to move the female detainee out of Cell 126 and then move the male detainee in Cell 124 into Cell 127. PRDSMF ¶ 210.

Nonetheless, at about 3:00 p.m., Officer Escorsio returned Lalli to Cell 135. Officer Escorsio failed to take away Lalli's bedding, and Lalli was not placed in a

suicide smock at that time. PRDSMF ¶ 217; DRPSAMF ¶ 403-05. Corporal Woll was aware of and participated in the decision about Lalli's temporary placement. DRPSAMF ¶ 403A. Officer Escorsio secured Lalli's two neighboring inmates in their cells, allowing only Lalli access to the adjoining day room. DRPSAMF ¶ 403. Before she left the area, Officer Escorsio told Lalli to "sit down" and "shut up" and warned him that she would have to bring him "up front in the turtle suit" if he did not do as he was told. DRPSAMF ¶ 404.

Next, Lalli made a call from the phone in the day room. DRPSAMF ¶ 406. Lalli told the person on the other end of the line that he was going to kill himself. DRPSAMF ¶ 407.  Lalli then began pacing around the day room, screaming "I'm going to fucking kill myself" as loud as if he were "hollering to somebody 75 yards away." DRPSAMF ¶¶ 408-09.  While Lalli was still in the day room, he spoke with one of his neighboring inmates, telling him "he was going to kill himself" because he did not have anyone to take care of his daughter. DRPSAMF ¶ 410.

After spending about ten to fifteen minutes in the day room, Lalli went into Cell 135 and closed the door. DRPSAMF ¶ 411. Once inside, Lalli started kicking his door,  throwing things around his cell and creating a lot of noise and commotion. DRPSAMF ¶¶ 412, 363, 413.

Though Officer Escorsio testified that she conducted a welfare watch check on Lalli at 3:15 p.m. and then returned to his cell shortly afterwards to check on him again, one of Lalli's neighboring inmates testified that he was "pretty sure" Officer Escorsio did not return to Lalli's cell at all, while his other neighboring inmate

recalled seeing Officer Escorsio return only about 20 or 25 minutes later, just to holler into Lalli's cell from outside for him to quiet down. PRDSMF ¶¶ 220-21; DRPSAMF ¶ 415. Lalli stopped making noise after Officer Escorsio's visit. DRPSAMF ¶ 416. Additionally, Corporal Woll testified that he saw Lalli at least once after Officer Escorsio returned him to his cell as he walked the halls of the jail. PRDSMF ¶ 222.

Just before 3:30 p.m., Officer Escorsio asked Corporal Woll to perform Lalli's upcoming welfare watch check for her. PRDSMF ¶ 223. When Corporal Woll went to do the check, he stopped briefly to talk to another inmate who was requesting to make a phone call. PRDSMF ¶ 224. Before he reached Cell 135, however, he noticed a white sheet hanging from a divider pole. PRDSMF ¶ 224. Corporal Woll immediately ordered the door be opened and called for assistance. PRDSMF ¶ 225. Once inside, he found Lalli's blue and seemingly lifeless body hanging from the divider poll. DRPSAMF ¶ 417.

Corporal Woll and another corrections officer began performing chest compressions and CPR on Lalli. PRDSMF ¶ 227. Before long, paramedics arrived and removed Lalli from his cell. PRDSMF ¶ 227A; DRPSAMF ¶ 418. An ambulance rushed Lalli to Eastern Maine Medical Center, in Bangor, Maine, where doctors later diagnosed him with anoxic brain injury resulting from the suicide attempt. PRDSMF ¶ 227A; DRPSAMF ¶ 419.

### Jail Policies and Procedures Regarding Suicide Prevention

Sheriff Dennison, who had been sheriff since 2006, and Major Hinckley, who had been the jail's administrator since 2004, were the final policymakers at the jail. PRDSMF ¶¶ 68-69, 71-72, 73A. The Defendants do not indicate whether Sheriff Dennison has ever had instruction in suicide prevention, but Major Hinckley attended an eight-hour course on suicide detection and prevention in 1989. PRDSMF ¶ 70.

Lieutenant Carver, Assistant Jail Administrator, had been employed at the jail since 1989 and was responsible for coordinating training of the jail's personnel. PRDSMF ¶¶ 57-58; DRPSAMF ¶ 266. Lieutenant Carver completed a basic corrections course in 1990, which included training on suicide prevention. PRDSMF ¶ 59. Over the years, she completed several additional courses related to suicide prevention, including a 1992 training on suicidal inmates, a 1993 training on teaching suicide prevention in corrections, a 1995 training in developing and implementing jail-based mental health services, additional trainings in 1995 and 1996 on mental illness in jail, and three courses on suicide prevention in 2001, 2002, and 2005. PRDSMF ¶¶ 60-67.

As of October 3, 2009, the jail had several written policies and procedures addressing suicide, which could be found within the jail's policy and procedure manual. PRDSMF ¶¶ 235-236 and 238-238M. The jail's staff is trained on the jail's policies and procedures, and copies of the policy and procedure manual are kept in

the jail's control room and its intake room for officers to consult. PRDSMF ¶¶ 237-237.

The jail's policies and procedures require jail personnel to perform a suicide inmates screening assessment of each incoming detainee. *See* PRDSMF ¶ 238; Defs. Exh. 6, ECF No. 88-21 (instructing jail personnel to "thoroughly inspect" all inmates "for signs of physical injury, mental illness, drug use, alcohol use and suicidal intentions prior to accepting custody"); PRDSMF ¶¶ 238A and 238H; Defs. Exhs. 7, ECF Nos. 88-22 and 14, No. 88-29 (instructing the booking officer to observe inmates to determine whether they are "seriously depressed – having suicidal thoughts," to explain to inmates the procedures for obtaining medical attention, and to provide all medical screening information to the jail's physician). The intake officer conducts the assessment using the Suicide Assessment Form discussed earlier. *See* DRPSAMF ¶ 328; Pl's Exh. 2, ECF No. 88-17.

The policies require jail personnel to classify all detainees into different types of custody upon admission and to review this classification after 15 days, and again every 90 days thereafter. PRDSMF ¶ 238B and Defs. Exh. 8, ECF No. 88-23. The jail's policies distinguish between two different "watch levels" for detainees who poses risks to themselves. PRDSMF ¶¶ 101, 238E. Inmates on "suicide watch" are to be constantly supervised and observations detailing the inmate's behavior are to be recorded. *See* PRDSMF ¶ 238D and Defs. Exh. 10, ECF No. 88-25.

By contrast, an inmate under a "welfare watch," is only observed every ten to fifteen minutes. PRDSMF ¶¶ 101, 238E. Common jail practice mandates that

corrections officers take two further courses of action with respect to any detainee on welfare watch: (1) maintain a separate log documenting the detainee's condition at each of his fifteen-minute checks; and (2) ensure that the next time a mental health care worker visits the jail, that worker speaks with the detainee. PRDSMF ¶¶ 100-03.  The decision about whether to place a detainee on suicide watch or welfare watch is left to the shift supervisor working when the detainee arrives. DRPSAMF ¶¶ 295-96.

The jail also has a "Suicide Prevention Program" that states as its objective that "[t]he Knox County jail Staff will take every precaution to avert suicide and suicide attempts through an intensive program of assessment, detection, supervision, and staff training." The program lists its "elements" as:

> (a) Intake screening to detect potential suicidal behavior.
> (b) Training of mental health staff regarding the jail environment and criminal justice system.
> (c) Access to time[ly] assessment and treatment services, including outpatient care, psychiatric inpatient services and detoxification services.
> (d) Staff and electronic supervision of inmates.
> (e) Timely medical intervention.
> (f) Re-evaluation of inmates following a crisis period.
> (g) Environmental/architectural design conducive to reducing suicide potential.

PRDSMF ¶ 238K; Defs.' Exh. 17, ECF No. 88-32.

### Suicide Prevention Training of the Individual Defendants

The jail's policies require the Jail Administrator to "provide training for jail staff in recognizing behavior requiring psychiatric services" and to "maintain procedures for obtaining these services when jail staff feel the need is present."

PRDSMF ¶ 238J; Defs.' Exh. 16, ECF No. 88-27. In particular, "[a]ll full-time certified correctional officers" are directed to "be provided annual training" including training "in suicide prevention, detection and procedures." PRDSMF ¶ 238M; Defs.' Exh. 19, ECF No. 88-34. It is also the jail's policy to maintain documentation of the dates and subject-matter of trainings along with the names of the personnel who attended. *Id*. The jail's records indicate that it held suicide prevention trainings in January 1989, June 1992, October 1992, March 1993, June 1993, September 1994, October 1995, June 2001, October 2001, August 2002, December 2002, September 2005, August 2006, November 2006, December 2007, January 2008, February 2008, and December 2008. Pl.'s Exh. U, ECF No. 93-22 (jail suicide training records).

As noted in the following list, the individual defendants all had some training in suicide prevention as of October 3, 2009, though none had received annual trainings:

- Corporal Escorsio received training on special needs inmates and principles of suicide prevention in 2002; she completed a corrections course which included training on suicide prevention in 2004; and in December 2007, she received another training on suicide prevention. PRDSMF ¶¶ 3-5.

- Officer Heath III completed a corrections course in 1989, which included training on suicide prevention; in November 1991, he was an instructor for two trainings on special management inmates; and in June 2001, he received additional training on suicide prevention and defusing. PRDSMF ¶¶ 8, 10-11.

- Officer Stilkey began working for the jail only six months prior to Lalli's injuries. Prior to this, in September 2007, she had completed a corrections course that included training on suicide prevention; and in August and November 2006, December 2007, and December 2008 she had received suicide trainings through her former employment at the Waldo County Jail. PRDSMF ¶¶ 17-20.

- Officer Truppa completed a corrections course in 1990, which included training on suicide prevention, and he received additional training on suicide prevention in October 1995, June 2001, August 2002, September 2005, November 2006, and January 2008. PRDSMF ¶¶ 25-32.

- Sergeant Winslow completed a corrections course in 1999, which included training on suicide prevention, and he received additional trainings in suicide prevention in June and October 2001, August 2002, September 2005, November 2006, and December 2007. PRDSMF ¶¶ 35-41.

- Corporal Woll attended a corrections course in 2007 that included training on suicide prevention; and he received suicide prevention trainings in November 2006 and December 2007.  PRDSMF ¶¶ 43-45.

- Officer Wood completed a corrections course in 1991, which included training on suicide prevention; he received training on suicide prevention and recognition of aberrant behavior in October 1992; he completed a course on teaching suicide prevention in 1993; and he attended additional suicide prevention trainings in June 1993, June 2001, August 2002, and January 2008. PRDSMF ¶¶ 47-55.

### History of Suicide and Suicide Attempts at the Jail

In 2001, the Department of Corrections issued a report regarding the death of an inmate at the jail, which noted the jail's lack of timely suicide prevention trainings. *See* PRDSMF ¶ 256A; Pl.'s Exh. X, ECF No. 93-25. Lieutenant Carver's performance appraisal that year[9] references this report and notes that she was responsible for staff training. *Id.* At the time of Lalli's detention, the jail housed between 70 and 74 inmates. PRDSMF ¶ 256B. Between January of 2007 and October 3, 2009, the jail logged 26 "incidents of suicidal behavior." DRPSAMF ¶ 316.

---

[9]     At that time Carver's name was apparently "Kathy Wyman." Neither of the parties clarifies this point, though the Defendants do not deny that the performance appraisal is Carver's. *See* DRPSAMF ¶ 256A.

### Spoliation of Evidence Doctrine

In addition to the favorable inferences to which the Plaintiff is entitled to under the summary judgment standard, she argues that she is also entitled to the benefit of an adverse inference because the Defendants destroyed evidence relevant to her claims.

The facts relevant to this assertion are as follows. The Knox County Jail operates two video cameras that capture footage of the jail's intake area. DRPSAMF ¶ 326. The camera captures only images, not audio, and records only the jail's main holding area, not the detainees' individual cells. DRPSAMF ¶ 327. As a matter of routine data maintenance, the jail records over the footage captured by the camera every seven to thirty days. DRPSAMF ¶ 327. After Lalli's suicide attempt on October 5, 2009, jail officials failed to take any action to preserve the footage recorded during Lalli's stay. DRPSAMF ¶ 327. As a result, the footage was recorded over before the Plaintiff filed her suit. DRPSAMF ¶ 327.

Pointing to these facts, the Plaintiff contends that the court should apply the "spoliation of evidence" doctrine, outlined in *Gomez v. Stop & Shop Supermarket Co.*, 670 F.3d 395 (1st Cir. 2012), and sanction the Defendants by drawing an inference that the missing footage would have shown that the events that took place in the intake area during Lalli's time in custody support the Plaintiff's claims.

In the Plaintiff's responses to the Defendants' statement of material facts, she identified seven specific instances where the missing security-camera footage might have refuted facts the Defendants claimed were uncontroverted: (1) that

Officer Stilkey performed welfare watch checks on Lalli beginning at 8:30 p.m., October 3, 2009 and ending at October 4, 2009, *see* PRDSMF ¶¶ 105-06, 239; (2) that the welfare watch logs reflect that Lalli was quiet and compliant between 12:30 a.m. and 11:45 a.m. on October 4, 2009, *see* PRDSMF ¶¶ 107A, 239; (3) that the welfare watch logs reflect that Lalli appeared okay between 6:00 p.m., October 4, 2009 and 6:00 a.m., October 5, 2009, *see* PRDSMF ¶ 115A, 239; (4) that Officers Wood, Truppa and Heath III did not hear Lalli say he was going to kill himself after they returned him to the jail's intake area, *see* PRDSMF ¶ 191A; (5) that Officer Escorsio did not observe Lalli's severe distress after he returned to the jail from the courthouse, *see* PRDSMF ¶¶ 201, 203; (6) that Officer Escorsio performed welfare watch checks on Lalli at 3:00 p.m. and 3:15 p.m., *see* PRDSMF ¶¶ 220, 239; and (7) that Officer Escorsio went back to Lalli's cell a third time shortly after 3:15 p.m. *See* PRDSMF ¶ 221.

Under the spoliation of evidence doctrine, "a trier of fact may (but need not) infer from a party's obliteration of evidence relevant to a litigated issue that the contents of the evidence were unfavorable to the party." *Gomez v. Stop & Stop Supermarket Co.*, 670 F.3d 395, 399 (1st Cir. 2012) (quoting *Testa v. Wal-Mart Stores, Inc.*, 144 F.3d 173, 177 (1st Cir. 1998)) (internal quotation marks and original brackets omitted). The doctrine has two main rationales:  first, "that a party who destroys a document (or permits it to be destroyed) when facing litigation, knowing the document's relevancy to issues in the case, may well do so out of a sense that the document's contents hurt his position," *Testa*, 144 F.3d at

177; and second, that imposing sanctions "serves to deter litigants from destroying relevant evidence prior to trial and to penalize a party whose misconduct creates the risk of an erroneous judgment." *Booker v. Mass. Dep't of Pub.* Health, 612 F.3d 34, 46 (1st Cir. 2010).

Proponents of an inference based on spoliation must establish a two-part evidentiary foundation. *Id*. First, they must "show that the party who destroyed the [evidence] 'knew of . . . the claim (that is, the litigation or the potential for litigation.'" *Id.* (quoting *Testa*, 144 F.3d at 177). Second, they must show "the [evidence]'s potential relevance to that claim." *Testa*, 144 F.3d at 177. Additionally, "[a] key consideration in whether to impose sanctions for spoliation of evidence is the 'degree of fault of the offending party.'" *Parlin v. Cumberland Cnty.*, No. 08-cv-186-P-S, 2009 WL 2998963 at *2 (D. Me. Sept. 16, 2009) (quoting *Collazo–Santiago v. Toyota Motor Corp.,* 149 F.3d 23, 29 (1st Cir. 1998)).

In the Plaintiff's opposition to the Defendants' motion and the Plaintiff's responses to the Defendants' statement of material facts, she seems to be asking for the Court to draw an adverse inference against five individual defendants: Officers Stilkey, Wood, Truppa, Heath III, and Escorsio. However, the Plaintiff has failed to present any evidence that these officers—nor the three other individual defendants named in the complaint—played any role in the jail's failure to preserve the intake area security-camera footage. As this District has noted in two previous cases, "[i]t would be inequitable to sanction a blameless party for another's spoliation of evidence." *Parlin v. Cumberland Cnty.*, No. 08-cv-186-P-S), 2009 WL 2998963 at *2

(D. Me. Sept. 16, 2009); *Driggin v. Am. Sec. Alarm Co.,* 141 F. Supp. 2d 113, 123 (D. Me. 2000)). Furthermore, under the plaintiff-friendly summary judgment standard, the Court is already adopting the Plaintiff's version of events regarding the disputed facts that pertain to Officers Wood, Truppa, Heath III, and Escorsio. Accordingly, the Court declines to draw the requested inferences against any of the individual defendants.

With respect to the Municipal Defendants, the Plaintiff has failed to establish the relevance of the missing evidence to her claims. Plaintiff's claim against the Municipal Defendants is based on failure to train the jail's staff adequately and on giving the shift supervisor too much discretion to determine the type of watch on which to place a troubled inmate. The Court fails to see how any evidence which might have been on the intake area surveillance camera would be material to the claims against the Municipal Defendants. The Court therefore declines to draw the requested inferences against the Municipal Defendants as well.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, the Court shall grant summary judgment "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a summary judgment motion, the court must "bear in mind that not every genuine factual conflict necessitates a trial." *Martinez v. Colon*, 54 F.3d 980, 984 (1st Cir. 1995). Instead, "[i]t is only when a disputed fact has the potential

to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared." *Id.*

If the moving party will not bear the burden of proof at trial, the moving party can make a prima facie case that it is entitled to summary judgment by either submitting evidence that negates an essential element of the nonmoving party's claim or demonstrating that the nonmoving party's evidence is insufficient to establish an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (White, J., concurring). The nonmoving party may defeat the movant's prima facie entitlement to summary judgment by demonstrating to the Court specific facts in the record overlooked or ignored by the moving party that support the essential elements of the party's claim. *Id.* at 331-32; *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The Court "views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.,* 632 F.3d 31, 35 (1st Cir. 2011). However, the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London,* 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Rogan v. City of Boston,* 267 F.3d 24, 27 (1st Cir. 2001)).

"[T]he ground rules for summary judgment leave 'no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose his own ideas of

probability and likelihood (no matter how reasonable those ideas may be)' on the cold pages of the record." *Rodriguez v. Municipality of San Juan*, 659 F.3d 168, 175 (1st Cir. 2011) (quoting *Greenburg v. P.R. Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987)).   Furthermore, "courts must be exceptionally cautious" in taking questions of state-of-mind away from the jury at summary judgment. *In re Varrasso*, 37 F.3d 760, 764 (1st Cir. 1994).

## DISCUSSION

### A.   § 1983 Claims Against Individual Defendants

#### 1.  Deliberate Indifference

Section 1983 of the Civil Rights Act allows United States citizens to bring a claim for redress against any person acting under color of state law who causes a deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. The statute provides plaintiffs a cause of action and a vehicle to obtain federal court jurisdiction, but it does not provide any substantive rights independent of those otherwise granted under federal law or the United States Constitution. *Roman-Oliveras v. P.R. Elec. Power Auth.*, 655 F.3d 43, 47 (1st Cir. 2011).

The Due Process Clause of the Fourteenth Amendment[10] prohibits states and their subdivisions from acting with deliberate indifference to a substantial risk of

---

[10]     "Pretrial detainees are protected under the Fourteenth Amendment Due Process Clause rather than the Eighth Amendment," which contains the Cruel and Unusual Punishment Clause, as they have not been convicted of a crime and thus are not subject to punishment. *Burrell v. Hampshire Cnty.*, 307 F.3d 1, 7 (1st Cir. 2002); *see also City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). However, the Fourteenth Amendment provides pretrial detainees with protections

serious harm to the health of a pretrial detainee. *Coscia v. Town of Pembroke*, *Mass.* 659 F.3d 37, 39 (1st Cir. 2011). This includes the risk that pretrial detainees will seriously harm themselves while in state custody. *See Elliot v. Cheshire Cnty.*, *N.H.*, 940 F.2d 7, 10-12 (1st Cir. 1991).

To determine whether a Fourteenth Amendment violation has occurred, the First Circuit applies the formulation of the "deliberate indifference" standard announced in *Farmer v. Brennan*, 511 U.S. 825 (1994). *Burrell*, 307 F.3d at 7. To succeed on a claim decided under this standard, the plaintiff must satisfy both objective and subjective inquiries. *Leavitt v. Corr. Med. Servs., Inc.*, 645 F.3d 484, 497 (1st Cir. 2011). First, he must show that the deprivation alleged was "objectively, sufficiently serious." *Id.* (internal citations and quotation marks omitted). Second, he must show "that prison officials possessed a sufficiently culpable state of mind . . . ." *Id.* (internal citations and quotation marks omitted).

To prevail in a deliberate indifference case involving a "failure to prevent harm," the objective prong requires the plaintiff to show that he was detained "under conditions posing a substantial risk of serious harm." *Farmer,* 511 U.S. at 834.[11] As this District has previously determined, "[t]here is no dispute, nor should there be, that suicide is a serious harm under *Farmer*." *Martin v. Somerset Cnty.*,

---

at least as great as the Cruel and Unusual Punishment Clause provides convicted prisoners. *Revere*, 463 U.S. at 244.

[11]     Both the Defendant and the Plaintiff refer to a triad of inmate suicide cases decided in the early nineties in which the First Circuit used slightly different formulations for the risk of harm inquiry. *Torraco v. Maloney*, 923 F.2d 231, 236 (1st Cir. 1991) ("strong likelihood" formulation); *Elliot v. Cheshire Cnty.*, 940 F.2d 7, 10 (1st Cir. 1991) ("large risk" formulation); *Manarite v. City of Springfield*, 957 F.2d 953, 956 (1st Cir. 1992) ("unusually serious risk" formulation). The Court follows the formulations set forth in *Farmer*, which held that a plaintiff must demonstrate a "substantial" risk of serious harm. *See Farmer*, 511 U.S. at 834.

387 F. Supp. 2d 65, 76 (D. Me. 2005) (internal citations omitted). Thus, where officials fail to prevent a detainee's suicide attempt, the objective inquiry focuses on whether the individual was already a substantial suicide risk at the time the defendant allegedly acted with deliberate indifference. *See id.*

Under the subjective prong, the plaintiff must show that the official in question was aware of the "excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Thus, the plaintiff must demonstrate not only that "the official [was] aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," but also that the official actually drew the inference. *Id.* This does not mean, however, that the Court must rely on the self-serving testimony of jail officials regarding what risks they were or were not aware of, or what conclusions they did or did not reach. *Id.* at 842.  Instead, the required subjective proofs may be made "in the usual ways," including by "inference from circumstantial evidence." *Id.*  For example, "a fact finder may conclude that a[n] . . . official knew of a substantial risk from the very fact that the risk was obvious," though the official may also present evidence to show that he or she "was unaware of even an obvious risk." *Id.* at 843-44.

Finally, the deliberate indifference standard also takes into account an official's response: a defendant may be found liable only if he or she "'consciously disregard[s]' a substantial risk of serious harm" or "culpably ignores or turns away from what is otherwise apparent."  *Farmer*, 511 U.S. at 839 (quoting the Model Penal Code's definition of criminal recklessness, Model Penal Code § 2.02(2)(c));

33

*Alsina-Ortiz v. Laboy*, 400 F.3d 77, 82 (1st Cir. 2005). Thus, an official who is aware of a substantial risk of serious harm may be found liable if he "fails to take reasonable measures to abate" the risk or "fail[s] to take appropriate mitigating action." *Farmer*, 511 U.S. at 847; *Ramos v. Patnaude*, 640 F.3d 485, 489 (1st Cir. 2011). By contrast, a similarly placed official may not be found liable if he "'respond[s] reasonably to the risk,'" whether or not the harm is avoided. *Giroux v. Somerset Cnty.*, 178 F.3d 28, 32 (1st Cir. 1999) (quoting *Farmer*, 511 U.S. at 844).

The First Circuit's application of *Farmer* provides guidance as to how the deliberate indifference standard applies in situations similar to this case. Where a claim "concerns not the absence of help, but the choice of a certain course of treatment," the Court will find deliberate indifference only "where the attention received is so clearly inadequate as to amount to a refusal to provide essential care." *Feeney v. Corr. Med. Servs., Inc.*, 464 F.3d 158, 163 (1st Cir. 2006) (internal quotation marks and citations omitted). In *Feeney*, the First Circuit held that prison medical officials were not deliberately indifferent where they initially treated a prisoner's foot pain with shoe inserts, pain medication, and physical therapy, all of which failed to resolve the problem, rather than the custom-molded orthotics which later proved effective. *Id.* at 160.  However, even an official who affirmatively responds to a risk may be found deliberately indifferent if the response fails to address the problem and instead appears to be an effort to "paper [the official's] file" or "lull [the inmate] into complacency." *Leavitt*, 645 F.3d at 499. Accordingly, in *Leavitt*, the First Circuit held that a medical official may have been deliberately

indifferent in treating an inmate with HIV where the official took *some* passive action—ordering blood tests, gathering the inmate's medical history, and reviewing some of the inmate's medical records—but consciously chose *not* to read a critical report which would have revealed that the inmate's viral load was unusually high and the inmate required immediate medical attention. *Id.* at 488-90, 499. Finally, where a claim involves an allegation that an official failed to communicate information about a specific risk facing an inmate to other officials charged with protecting that inmate, an official may be found deliberately indifferent if it was within the official's "scope of . . . responsibility" to transmit that information. *Giroux*, 178 F.3d at 34. Accordingly, in *Giroux*, the First Circuit held that a shift supervisor could be found deliberately indifferent where he failed to inform corrections officers under his command that an inmate faced a threat of attack from a particular group of inmates and those officers later placed the inmate in an unguarded holding cell with a member of that group. *Id.*

### a. Officer Stilkey

#### i. The objective risk

There was a substantial risk that Lalli would attempt suicide when Officer Stilkey and Sergeant Winslow admitted him into the jail on October 3, 2009. When Officer Stilkey asked Lalli at intake whether he was "currently feeling like killing [himself]," he replied that he was "not sure," but believed that "his life [was] over." PRDSMF ¶ 90; DRPSAMF ¶ 328. In response to other queries, he offered that he had attempted suicide about two years earlier, that he had been admitted to a

hospital for psychiatric treatment two weeks earlier, and that he had considered killing himself one week earlier.  PRDSMF ¶ 90; DRPSAMF ¶ 328. Additionally, Lalli was crying on and off during his intake interview and, according to Officer Stilkey's subsequent written assessment, appeared "very depress[ed]." PRDSMF ¶ 91; DRPSAMF ¶ 329.

The facts here are roughly in line with those of both *Torraco*, 923 F.2d 231, and *Elliot*, 940 F.2d 7. In *Torraco*, the First Circuit held that a triable issue of fact existed as to whether an inmate had an objectively "serious mental health need" where he had attempted suicide twenty months earlier, assaulted a prison official sixteen months earlier, and overdosed on THC pills five days earlier. *Torraco*, 923 F.2d at 235 n.4. In *Elliot*, the First Circuit held that a triable issue of fact existed as to whether there was an objectively "large risk" that a detainee would attempt suicide where, in the previous week, the detainee had violently banged his head against the bars of his cell, expressed irrational fears that the water in the jail was contaminated, and told another detainee he wanted to drown himself in the toilet and end his life. *Elliot*, 946 F.2d at 9-12.

Viewing the facts in the light most favorable to the Plaintiff and drawing all inferences in her favor, there is a material dispute of fact regarding whether there was already a substantial risk Lalli would attempt suicide when he was admitted into the jail on October 3, 2009.

ii.   **Officer Stilkey's subjective awareness of the risk**

The next question is whether Officer Stilkey knew of the substantial risk that Lalli would attempt suicide. There is no doubt that Officer Stilkey was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]." *Farmer*, 511 U.S. at 837. She completed Lalli's suicide risk assessment form and his medical screening form and observed his depressed affect first-hand.

However, the Court must further determine whether Officer Stilkey actually drew the inference that Lalli was at serious risk of attempting suicide. The Defendants contend that Officer Stilkey failed to draw the inference, noting that she wrote in Lalli's suicide risk assessment that she "[didn't] think he would [attempt suicide] if he talk[ed] to someone" and that she thought "he'd be ok." DRPSAMF ¶ 329.

But under *Farmer*, a claimant "need not show that a [jail] official acted or failed to act *believing* that harm actually would befall an inmate." *Farmer*, 511 U.S. at 842 (emphasis added). Rather, "it is enough that the official acted or failed to act despite his knowledge of a *substantial risk* of serious harm." *Id.* (emphasis added). Furthermore, "courts must be exceptionally cautious" in making determinations regarding state-of-mind at the summary judgment phase of a lawsuit, as state-of-mind is typically an issue of fact left for the jury. *In re Varrasso*, 37 F.3d at 764.

Here, under one plausible interpretation of the facts, Officer Stilkey concluded that Lalli might well attempt to harm himself *unless* he was able to

"talk[ ] to someone." DRPSAMF ¶ 329. Further, the record shows that Officer Stilkey was sufficiently concerned about Lalli's mental condition that she called her supervisor, Sergeant Winslow, and told him he needed to review Lalli's risk assessment form personally. DRPSAMF ¶ 334. Taken in the light most favorable to the Plaintiff, these facts do create a triable issue regarding whether Officer Stilkey drew the inference that there was a substantial risk Lalli would attempt suicide.

### iii.    The sufficiency of Officer Stilkey's response

Even if Officer Stilkey was aware of a substantial risk that Lalli would seriously harm himself, she cannot be held liable for violating Lalli's Fourteenth Amendment rights unless she "culpably ignore[d] or turn[ed] away" from a substantial risk of serious harm. *Alsina-Ortiz*, 400 F.3d at 82. If she acted reasonably to avoid the risk of harm, liability is inappropriate. *Giroux*, 178 F.3d at 33.

Here, Officer Stilkey responded by specifically alerting Sergeant Winslow, her supervisor, to Lalli's condition and asking him to review her risk assessment and to speak with Lalli himself. DRPSAMF ¶ 334. The Plaintiff contends that Officer Stilkey's actions were deliberately indifferent because she acquiesced to her supervisor's decision to place Lalli on a fifteen-minute welfare watch and failed to call Mid-Coast Mental Health and request a mental health evaluation for Lalli. However, the deliberate indifference standard places no burden on jail officials to override the will of their superiors. *Adaweh v. Corr. Med. Servs.*, No. 1:11-cv-00172-GZS, 2011 WL 6834090, at *3 (Dec. 28, 2011 D. Me. 2011), *adopted by* 2012 WL

398350 (Feb. 7, 2012 D. Me. 2012) (dental hygienist not deliberately indifferent for failing to override dentist's decision not to treat prisoner's cavities). Where a claim involves "the choice of a certain course" of remedial action, the Court will not find deliberate indifference unless the defendant's actions amounted to "a refusal to provide essential care." *Feeney*, 464 F.3d at 163 (internal quotation marks and citations omitted). Here, Officer Stilkey made no such refusal. The record allows only one fair interpretation: Officer Stilkey developed genuine concerns about Lalli's mental health and took active steps to ensure that Sergeant Winslow, the official charged with deciding how to handle Lalli's case, was aware of her concerns. At worst, Officer Stilkey's failure to call Mid-Coast Mental Health may have been negligent. However, deliberate indifference proscribes only a "narrow band of conduct" more culpable than negligence. *Leavitt*, 645 F.3d at 497.

The Plaintiff's claim against Officer Stilkey fails at the final step of the deliberate indifference inquiry. Because the Plaintiff has failed to point to concrete facts in the record indicating Officer Stilkey consciously disregarded a substantial risk that Lalli would commit suicide, Officer Stilkey is entitled to summary judgment.

### b. Sergeant Winslow

### i.   The objective risk

The objective situation facing Sergeant Winslow on the evening of October 3, 2009 was essentially the same as that facing Officer Stilkey. Accordingly, for the reasons discussed above, there is a material dispute of fact regarding whether Lalli

was at a substantial risk of serious harm when Sergeant Winslow reviewed Lalli's suicide risk assessment and decided to place Lalli on a fifteen-minute welfare watch.

### ii.   Sergeant Winslow's subjective awareness of the risk

Though Sergeant Winslow did not personally conduct Lalli's suicide risk assessment, he did review Lalli's entire file after Officer Stilkey completed it. Accordingly, he was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]." *Farmer*, 511 U.S. at 837.

Given the number of troubling facts contained in Lalli's file—his past suicide attempt, his recent suicidal ideation, and the ambiguous answer he provided when Officer Stilkey asked him whether he was currently suicidal—a reasonable jury could infer that the risk that Lalli would attempt suicide was so obvious that Sergeant Winslow must have realized it. *See Farmer*, 511 U.S. at 843-44. For this reason, there is a material dispute of fact regarding whether Sergeant Winslow was subjectively aware that there was a substantial risk that Lalli would seriously harm himself.

### iii.   The sufficiency of Sergeant Winslow's response

A reasonable fact-finder could conclude that after reviewing Lalli's file and suicide risk assessment, Sergeant Winslow took the sole action of placing Lalli on a welfare watch. PRDSMF ¶ 100. Jail policy calls for guards to regularly check on all detainees housed in its intake wing every fifteen minutes, so placing a detainee on welfare watch does not change how often the detainee is visited or monitored.

DRPSAMF ¶¶ 338-339. Instead, it has only two practical effects. First, as guards complete their regularly scheduled fifteen-minute checks of a welfare watch detainee, they are required to record their observations about the detainee's condition in a separate welfare watch logbook. PRDSMF ¶ 100. Second, the next time a mental health worker from ARCH visits the jail, that worker is required to meet one-on-one with the welfare watch detainee. PRDSMF ¶ 103. In this case, an ARCH health care worker next visited the jail on October 6, 2009, three days after Lalli's arrival and a day after his suicide attempt. PRDSMF ¶ 103.

There is no evidence that any jail official was charged with reading or analyzing the welfare watch logbook or taking any specific action based on what prison guards entered into it. A reasonable jury could conclude that requiring guards to record their observations in a welfare watch logbook has no practical effect and serves only to paper the jail's file. *Leavitt*, 645 F.3d at 488-90, 499.

Likewise, the only action Sergeant Winslow took to ensure Lalli received mental health support was to provide for Lalli to see a social worker whenever that social worker next happened to be on the premises. A reasonable jury could conclude that this action did nothing to prevent Lalli from attempting suicide in the intervening time.  Based on Lalli's responses, the suicide assessment form required the jail to call MCMH. The form is ambiguous as to who had the duty to call.  A reasonable jury could find that it was incumbent upon Sergeant Winslow, as the shift supervisor, to ensure that the call was made. PRDSMF ¶ 102-103.

Finally, a reasonable jury could conclude that Sergeant Winslow failed to take reasonable measures that were available to him. He failed to place Lalli in either of the jail's suicide prevention cells, instead placing him in a regular cell containing objects he could use to harm himself, including bed sheets. PRDSMF ¶ 226; DRPSAMF ¶¶ 271, 274, 417. He failed to place Lalli on suicide watch, under which jail guards would have monitored him continuously, instead placing him on welfare watch, under which he was monitored no more than any other pretrial detainee in the jail's intake wing. DRPSAMF ¶ 338; Defs.' Exh. 12 at 3, ECF No. 88-27.

Sergeant Winslow's involvement in Lalli's case was almost two days removed from Lalli's suicide attempt, but this fact alone does not preclude liability. As the Supreme Court has made clear, a § 1983 defendant who violates the Constitution is "'responsible for the natural consequences of his actions.'" *Malley v. Briggs*, 475 U.S. 335, 344 n.7 (1986) (quoting *Monroe v. Pape*, 365 U.S. 167, 287 (1961)). And as the First Circuit has explained, this includes "'consequences attributable to reasonably foreseeable intervening forces, including the acts of third parties.'" *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 561 (1st Cir. 1989) (quoting *Marshall v. Perez Arzuaga*, 828 F.2d 845, 848 (1st Cir. 1987)).

Here, a reasonable fact-finder could infer that Sergeant Winslow was the only jail official charged with evaluating and acting upon the information the jail collected during Lalli's intake. The decisions that he made about Lalli's housing and monitoring regime set a baseline which affected how everyone else at the jail

interacted with Lalli. The other corrections officers who encountered Lalli may have been lulled into complacency by the fact that the official charged with reviewing Lalli's intake file decided he merited only welfare watch treatment.

Taking the facts in the light most favorable to the Plaintiff and drawing all inferences in her favor, a fact-finder could conclude that Sergeant Winslow took essentially no action to reduce the substantial risk that Lalli would attempt to kill himself before ARCH's next visit to the jail, three days later. Under this view of the facts, this is not a case where Sergeant Winslow merely chose between different "course[s] of treatment," but rather one where he failed to provide any meaningful help at all. *Feeney*, 464 F.3d at 163 (internal quotation marks and citations omitted); *see also Leavitt*, 645 F.3d at 499. Accordingly, there is a triable issue of fact regarding whether Sergeant Winslow "culpably ignore[d]" a substantial risk that Lalli would seriously harm himself. *Alsina-Ortiz*, 400 F.3d at  82.

### c.  Officer Heath IV

The Plaintiff does not oppose the Defendants' motion with respect to Officer Heath IV. Accordingly, the court grants the Defendants' motion for summary judgment with respect to the Plaintiff's § 1983 claim against Officer Heath IV.

### d.  Officer Wood

#### i.    The objective risk

The Defendants concede, for purposes of their motion for summary judgment, that there is a genuine issue of material fact regarding whether there was a

substantial risk that Lalli would seriously harm himself on the afternoon of October 5, 2009, when Officer Wood encountered Lalli.

### ii.    Officer Wood's subjective awareness of the risk

The parties dispute exactly what Officer Wood observed on the afternoon of October 5, 2009. Officer Wood admits that he heard Lalli suddenly exclaim, while the judge was addressing him, that "[i]t's over" and that he "need[ed] to get out." PRDSMF ¶¶ 162, 172, 183. He concedes that these statements were a "red flag," but he also claims he never heard Lalli say he was going to kill himself. PRDSMF ¶ 183; Aff. of Robert Wood ¶ 12, ECF No. 88-15.

By contrast, the Plaintiff's witnesses contend Lalli threatened to kill himself numerous times in Officer Wood's presence. DRPSAMF ¶¶ 364, 366, 372, 375, 377, 380, 382-83, 385-87, 389-90; PRDSMF ¶¶ 156, 158. A reasonable fact-finder could infer that he witnessed at least some of Lalli's behavior and was therefore aware of facts which indicated "a substantial risk of serious harm." *Farmer*, 511 U.S. at 837.

At issue, then, is whether Officer Wood actually drew the inference that a there was a substantial risk. The Defendants claim that the Court must take Officer Wood at his word that he did not realize Lalli was suicidal. However, the Court need not rely on self-interested testimony, as the required state-of-mind may be proved "in the usual ways," such as by showing that the risk was so obvious that the Officer Wood must have been aware of it. *Id.* at 842-44.

Here, given the sheer number of times Lalli allegedly explicitly threatened to kill himself in Officer Wood's presence, a reasonable fact-finder could conclude that

the risk of self-harm was so obvious that Officer Wood must have been aware of it. Additionally, after Lalli told his defense attorney that he "didn't have anything to live for" if he was denied bail, Officer Wood allegedly responded by threatening to put Lalli in a "turtle suit," a slang term for a suicide smock. PRDSMF ¶ 165; DRPSAMF ¶ 373. This comment also supports a conclusion that Officer Wood was aware of the risk of a suicide attempt.

### iii.   The sufficiency of Officer Wood's response

Armed with the awareness that there was a substantial risk that Lalli would attempt to seriously hurt himself, Officer Wood essentially took no action. He never told anyone back at the jail about the behavior Lalli exhibited earlier in the day, nor did he take any other affirmative action to ensure Lalli's safety. As the only transport officer assigned to the van Lalli traveled in, Officer Wood was in the best position to monitor Lalli during his trip to and from the courthouse. Thus, as with the shift supervisor in *Giroux*, a reasonable jury could find that it was within Officer Wood's "scope of responsibility" to inform the officials back at the jail about what transpired in the van and in the courthouse, so that they could take appropriate action in response. *Giroux*, 178 F.3d at 34.

Accordingly, viewing the facts in the light most favorable to the Plaintiff, Officer Wood was aware of a substantial risk that Lalli would seriously harm himself and consciously disregarded that risk by failing to take any meaningful action at all.

### e. Officers Heath III and Truppa

The facts surrounding the claims against Officers Heath III and Truppa are largely the same. For that reason, the Court discusses their claims together.

#### i.    The objective risk

For purposes of their motion for summary judgment, the Defendants concede that a substantial risk of serious harm existed when Officers Heath III and Truppa accompanied Lalli to and from the Knox County District Court. Accordingly, the Court presumes that the objective prong is satisfied.

#### ii.    Officer Heath III and Truppa's subjective awareness of the risk

Officers Heath III and Truppa also served as transport officers on October 5, 2009, but they rode to and from the courthouse in a separate van from Officer Wood and Lalli. PRDSMF ¶¶157, 157A. Once in the courtroom, though, they were seated closer to the inmates than Officer Wood and, unlike Officer Wood, they never left the courtroom to bring paperwork to the clerk's office. Therefore, a reasonable fact-finder might conclude that Officers Heath III and Truppa heard *all* the comments that Lalli made in the courtroom.

Further, both Officers Heath III and Truppa personally admitted to observing some of Lalli's more troubling behavior. For instance, Officer Heath III testified that he saw Lalli grow upset when the judge spoke to him, that he heard Lalli plead with the judge to release him, including telling the judge that it "would all be over" if he was held and that he would "just end it," and that he observed Lalli grow more and more agitated as the proceedings continued. PRDSMF ¶ 169.

46

Likewise, Officer Truppa admitted that he heard Lalli beg the judge to release him, and say that he would lose his job and custody of his child if the judge denied his bail. PRDSMF ¶¶ 170-71. Officer Truppa also testified he heard Lalli say to the judge, "[t]his is no good," "I have to get out," and "[t]his is going to wreck my life." PRDSMF ¶¶ 170-71.

Accordingly, a reasonable jury could find that both Officers Heath III and Truppa observed suicidal behavior by Lalli on the afternoon of October 5, 2009 and were aware that Lalli's mental state deteriorated after the judge declined to release him. Therefore, there is a triable issue regarding whether Officers Heath III and Truppa were aware of facts indicating there was a substantial risk Lalli would attempt to seriously harm himself.

Though both Officers Heath III and Truppa testified that they did not actually realize the risk facing Lalli, the Court is not obliged to credit their self-interested testimony. *See Farmer*, 511 U.S. at 842-44 (1994); *In re Varrasso*, 37 at 764. Based on the persistent and explicitly suicidal behavior which the officers witnessed, a reasonable fact-finder could conclude that the risk that Lalli would attempt to kill himself was obvious and therefore Officers Heath III and Truppa must have been aware of it.

### iii.   The sufficiency of Officer Heath III and Truppa's responses

The Plaintiff alleges that, like Officer Wood, Officers Heath III and Truppa failed to take any action at all in response to the substantial risk that Lalli would

attempt to kill himself. The summary judgment record, viewed in the light most favorable to the Plaintiff, supports this allegation.

Though Officers Heath III and Truppa did not drive Lalli to and from the courthouse, they were at Officer Wood's side from the moment Officer Wood returned to the intake area until the three transport officers left together to move the jail's vans out of the sallyport. PRDSMF ¶¶ 188-91. Accordingly, a reasonable jury could conclude that they were aware Officer Wood failed to notify anyone at the jail about Lalli's erratic behavior at the courthouse yet took no action to correct the omission.

Viewed in the light most favorable to the Plaintiff, the facts indicate Officers Heath III and Truppa took no action to forestall a substantial risk that Lalli would attempt to kill himself despite a duty to act. *See Giroux*, 178 F.3d at 34. Therefore, there is a triable issue regarding whether they "culpably ignore[d]" a substantial risk of serious harm. *Alsina-Ortiz*, 400 F.3d at 82.

### f.  Corporal Woll

#### i.    The objective risk

As with the other Defendants who dealt with Lalli on October 5, 2009, the objective risk that Lalli would seriously harm himself is conceded.

#### ii.    Corporal Woll's subjective awareness of the risk

The Plaintiff points to myriad facts showing that Corporal Woll, the shift supervisor on the day Lalli attempted suicide, was "aware of facts from which the

inference could be drawn that" there was a substantial risk that Lalli would seriously harm himself. *Farmer*, 511 U.S. at 837.

First, at around 7 a.m. on the morning of October 5th, Corporal Woll learned that Lalli had just told Officer Heath IV that he was "losing his mind" and that "if he was not allowed to be on the outside then it would be better if he wasn't alive at all." PRDSMF ¶¶ 119-20, 123. Second, later in the morning, when Corporal Woll spoke with Lalli personally, he learned that Lalli was concerned that he would lose custody of his child if he was not released on bail. PRDSMF ¶¶ 129, 132; DRPSAMF ¶¶ 348-349. When Corporal Woll asked Lalli if he wanted to speak with a mental health worker, Lalli told Corporal Woll "he would be doing all right as long as he got to court and got out to see his child," arguably implying that he might not be "all right" if he did not "get out to see his child." PRDSMF ¶¶ 133-34. Third, after Lalli returned from the courthouse, Corporal Woll was present in the jail's intake area as Lalli was "kicking" and "slamming around," and making numerous loud threats to kill himself. PRDSMF ¶ 194; DRPSAMF ¶¶ 394, 396, 398. Fourth, shortly afterwards, Corporal Woll overheard Lalli tell his mother over the phone that "if he didn't have his daughter, then he would rather die." PRDSMF ¶ 205-06. Fifth, after Lalli returned to Cell 135, he began pacing in the adjacent day room, screaming "I'm going to fucking kill myself" as loud as if he were "hollering to somebody 75 yards away." DRPSAMF ¶¶ 408-09. Viewing these facts in the light most favorable to the Plaintiff, there is a genuine issue of material fact as to whether Corporal Woll

was aware of facts demonstrating that there was a substantial risk Lalli would try to seriously harm himself on the afternoon of October 5, 2009.

It follows that a fact-finder could conclude, "from the very fact that [it] was obvious," that Corporal Woll actually drew the inference that a substantial risk faced Lalli. *Farmer*, 511 U.S. at 837, 842-43. This is further borne out by Corporal Woll's testimony that he viewed Lalli as a "potential risk" that morning, that he was "worried" about Lalli's safety after he overheard parts of his phone call, and that he was going to take steps to restrain Lalli and move him into a suicide prevention cell. PRDSMF ¶¶ 124, 208-09; DRPSAMF ¶¶ 271-72, 401-02.

### iii.   The sufficiency of Corporal Woll's response

The Defendants contend that Corporal Woll did not consciously disregard any risk to Lalli. By their account, Corporal Woll developed a reasonable plan to head off the danger and was in the process of executing that plan when Lalli was hurt. The plan was to move Lalli from Cell 135 to Cell 124, to change Lalli's observation level from welfare watch to suicide watch, and to restrain Lalli in a suicide smock. PRDSMF ¶¶ 207-08; DRPSAMF ¶ 402. They argue that Corporal Woll did not put these changes into place right away only because he was still busy processing returning inmates and needed to move other detainees to make room for Lalli in Cell 124. PRDSMF ¶¶ 210-15, 219.

However, Lalli attempted suicide before Corporal Woll put his plan into place. Rather than taking immediate action to an obvious threat, Corporal Woll delayed, allowing officials under his supervision to return Lalli to Cell 135 without

taking away his bed sheet, without restraining him, and without placing him under continuous observation. Further, the Defendants' explanation for Corporal Woll's failure to take action—that he was still busy completing administrative tasks and that other detainees needed to be moved before Lalli could be placed in Cell 124—falls short. The fact that Cell 124 was occupied and that he had other administrative tasks to complete explains only why Corporal Woll delayed moving Lalli to a suicide-safe cell, not why he delayed enacting the other available measures. A fact-finder could determine that it was grossly unreasonable for Corporal Woll to delay enacting these measures and that therefore Corporal Woll consciously disregarded the risk that Lalli would harm himself at the moment the risk was most acute.

### g.  Officer Escorsio

#### i.   The objective risk

The Defendants concede, for purposes of summary judgment, that there was an objectively substantial risk of serious harm when Officer Escorsio interacted with Lalli.

#### ii.   Officer Escorsio's subjective awareness of the risk

The record also substantiates that Officer Escorsio was "aware of facts from which the inference could be drawn" that there was a substantial risk that Lalli would seriously harm himself. *Farmer*, 511 U.S. at 837. First, Officer Escorsio was aware of Officer Heath IV's interactions with Lalli that morning. PRDSMF ¶¶ 120, 123; DRPSAMF ¶¶ 359, 360. Second, Officer Escorsio was present in the intake

area during periods when  Lalli was behaving erratically and threatening to kill himself.   DRPSAMF ¶ 364; PRDSMF ¶ 194; DRPSAMF ¶ 394, 396, 398. Third, Officer Escorsio was sitting near Lalli as he spoke to his mother on the phone and heard parts of the same conversation that led Corporal Woll to conclude that Lalli should be moved to suicide-safe cell, restrained, and placed on suicide watch. PRDSMF ¶ 202; DRPSAMF ¶ 402. Finally, Lalli was screaming that he was "going to fucking kill [him]self" as if he were "hollering to somebody 75 yards away" just before Officer Escorsio told him to quiet down.  DRPSAMF ¶¶ 408-14.

Based on this evidence, a reasonable fact-finder could conclude that the risk facing Lalli was "obvious" and therefore Officer Escorsio must have drawn the inference the he was at substantial risk of serious harm. This conclusion is further supported by Officer Escorsio's own words. First, Officer Escorsio testified that Lalli's phone conversation with his mother worried her enough that she wanted to move Lalli to a safer location. PRDSMF ¶ 209. Second, an inmate testified that when Officer Escorsio returned Lalli to Cell 135, she warned him that if he kept it up he would be put "up front in the turtle suit."  DRPSAMF ¶ 404. There is a genuine dispute of material fact regarding whether Officer Escorsio realized that Lalli faced a substantial risk of serious harm on the afternoon of October 5, 2009.

### iii.    The sufficiency of Officer Escorsio's response

Viewing the facts in the light most favorable to the Plaintiff and drawing all inferences in her favor, the record shows that Officer Escorsio returned Lalli to Cell 135 at around 3:00 p.m., allowing him access to both the day room and his private

cell, and that she failed to remove his bedding. DRPSAMF ¶¶ 403, 403A. Before leaving, Officer Escorsio commanded Lalli to "sit down" and "shut up" and warned him that he would be restrained in a "turtle suit" if he did not obey. DRPSAMF ¶ 404. Though the welfare watch policy mandated that Officer Escorsio check in on Lalli every fifteen minutes, a reasonable fact-finder could conclude she did not return for about 20 minutes.[12] PRDSMF ¶ 221; DRPSAMF ¶ 415. A reasonable fact-finder could also find that Officer Escorsio conducted only a cursory check, "holler[ing]" into Lalli's cell from outside that he needed to "quiet down" but never actually entering his cell or directly observing him. PRDSMF ¶ 221; DRPSAMF ¶ 415.

The summary judgment record demonstrates that Officer Escorsio failed to take any action to reduce the risk that Lalli would harm himself. At no point, for instance, did Officer Escorsio remove objects from Lalli's cell that he could use to harm himself, restrain Lalli in the suicide smock, arrange for Lalli to be observed continuously, or consult with the mental health provider about how to handle Lalli. A reasonable fact finder could conclude that Officer Escorsio's commands to "sit down" and "shut up," and threats of a "turtle suit" worsened Lalli's fragile condition.

Since Officer Escorsio took essentially no action to protect Lalli after he returned to Cell 135, there is a triable issue regarding whether Officer Escorsio

---

[12]     The parties disagree about whether or not Officer Escorsio checked on Lalli at 3:15 p.m., as Officer Escorsio contends and as she recorded in the Jail's logbook, or closer to 3:20 p.m., as the testimony of certain inmates suggests. At the summary judgment phase, the Court is obliged to resolve the discrepancy in favor of the Plaintiff. *See Rodriguez*, 659 F.3d at 175.

"culpably ignor[ed]" a substantial risk that serious harm would befall Lalli. *Alsina-Ortiz*, 400 F.3d at 82.

### 2. Qualified Immunity

#### a. The Legal Standard

All of the individual defendants argue that, even if their conduct did amount to deliberate indifference, they are entitled to summary judgment because qualified immunity shields them from liability. Where a constitutional violation is established, the doctrine of qualified immunity may be invoked to "protect[] a state official from liability for damages under § 1983." *Rocket Learning, Inc. v. Rivera-Sanchez*, 715 F.3d 1, 8 (1st Cir. 2013). "Qualified immunity is a judge-made construct that broadly protects public officials from the threat of litigation arising out of their performance of discretionary functions." *Bergeron v. Cabral*, 560 F.3d 1, 5 (1st Cir. 2009).

The First Circuit prescribes a two-step process to determine whether an official is entitled to qualified immunity. *Mosher v. Nelson*, 589 F.3d 488, 492 (1st Cir. 2009). First, the Court must determine "whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right." *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009). Second, the Court must determine "whether the right was 'clearly established' at the time of the defendant's violation." *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 816 (2009)).

Completing the "clearly established" step of the qualified immunity analysis requires answering two further questions. *Mosher,* 589 U.S. at 493. First, the Court

asks "whether 'the contours of the right were sufficiently clear that a reasonable official would understand that what he is doing violates that right . . . .'" *Id.* (quoting *Maldonado*, 568 F.3d at 269). Second, the Court asks "whether in the specific context of the case, 'a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights.'" *Id.* (quoting *Maldonado*, 568 F.3d at 269). If the answer to either of these questions is "no," the official in question is entitled to qualified immunity. *See Maldonado*, 568 F.3d at 269. The first question "focuses on the clarity of the law at the time of the alleged civil rights violation," while the second question "focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights."[13] *Maldonado*, 568 F.3d at 269.

As the First Circuit has elaborated, "[t]he 'clearly established' inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Rocket Learning*, 715 F.3d at 9 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)) (internal quotation marks omitted in the original). Accordingly, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful *in the situation he confronted*." *Saucier*, 533 U.S. at 202 (emphasis added). On the other hand,

---

[13]     One law review article helpfully distinguishes the two inquiries in the following way: "Essentially, there are two categories of qualified immunity arguments. Defendants might argue that the relevant rule at the time of their alleged conduct was vague or unclear. Alternatively, defendants might argue that, given the information in their possession at the time of the alleged violation, a reasonable officer would (or could) conclude that the conduct was lawful." Teressa E. Ravenell, *Hammering in Screws: Why the Court Should Look Beyond Summary Judgment When Resolving § 1983 Qualified Immunity Disputes*, 52 Vill. L. Rev. 135, 138-39 (2007) (footnotes omitted).

"[c]learly established law does not depend on identical circumstances repeating themselves." *Mosher*, 589 F.3d at 493. "The law is considered clearly established 'either if courts have previously ruled that materially similar conduct was unconstitutional, or if 'a general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct at issue.'" *Guillemard-Ginorio v. Contreras-Gomez*, 585 F.3d 508, 527 (1st Cir. 2009) (quoting *Jennings v. Jones*, 499 F.3d 2, 16 (1st Cir. 2007) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997))). In other words, "notable factual differences may exist between prior cases and the circumstances at hand as long as the state of the law at the time gave the defendant 'fair warning' that his action or inaction was unconstitutonial." *Mosher*, 589 F.3d at 493 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2009)).

### b.  Applying the Standard

With respect to Sergeant Winslow, Corporal Woll, and Officers Wood, Heath III, Truppa, and Escorsio, "the facts alleged or shown by the plaintiff make out a violation of a constitutional right." *Maldonado*, 568 F.3d at 269. *See Coscia*, 659 F.3d at 39 (14th Amendment prohibits acting with deliberate indifference to a substantial risk of serious harm to a pretrial detainee). Accordingly, the Court must proceed to the two-step "clearly established" phase of the qualified immunity inquiry.

### i. Whether the contours of the right were sufficiently clear under established law

As of October 3, 2009, it had long been settled law that state jail officials violate the Due Process Clause of the Fourteenth Amendment when they act with deliberate indifference toward the risk that pretrial detainees will seriously harm themselves while in state custody. *See Elliot*, 940 F.2d at 10-12. It was also clearly established that the First Circuit applies the *Farmer v. Brennan* standard to cases involving pretrial detainees and that an official violates this standard "if he knows that [a pretrial detainee] face[s] a substantial risk of serious harm" but "disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847; *Burrell*, 307 F.3d at 7 (applying *Farmer*). Furthermore, as this District made clear in 2005, "[t]here is no dispute, nor should there be, that suicide is a serious harm under *Farmer*." *Martin*, 387 F. Supp. 2d at 76 (internal citations omitted). Thus, as a general matter, a reasonable official in the Defendants' position in October of 2009 would have known that it violates the Fourteenth Amendment to fail to take reasonable measures to thwart a known, substantial risk that a pretrial detainee will attempt suicide. *See Farmer*, 511 U.S. at 847; *Burrell*, 307 F.3d at 7; *Elliot*, 940 F.2d at 10-12; *Martin,* 387 F. Supp. 2d at 76. Lastly, it was also "clearly established" that a plaintiff may make out a deliberate indifference claim by showing that an official failed to communicate critical information about a specific, serious risk facing an inmate where it was within the official's scope of responsibility to do so. *Giroux*, 178 F.3d at 34.

### ii. The specific conduct at issue

In the cases against these six defendants—Sergeant Winslow, Corporal Woll, and Officers Wood, Truppa, Heath III, and Escorsio—the Plaintiff is able to make out essentially the same charge: that, faced with knowledge of a substantial risk to Lalli, each took effectively no action to protect him. The Defendants contend that this is not enough to defeat their qualified immunity defense. Instead, they argue, the Court should require the Plaintiff to identify a case where a court has held that placing a pre-trial detainee or convicted inmate on fifteen-minute checks violated the Constitution. Defs.' Reply Mem. 20, ECF No. 102.

This argument misunderstands the "clearly established law" inquiry. Where a general constitutional rule "applies with obvious clarity" to the defendants' conduct, identifying a case involving "identical circumstances" is not necessary. *Guillemard-Ginorio*, 585 F.3d at 527; *Mosher*, 589 F.3d at 493. The Defendants' alleged conduct—effectively failing to take *any* action to forestall the risk that Lalli would attempt suicide at the moment he did—clearly falls under the "general constitutional rule" that it violates the Fourteenth Amendment to fail to take reasonable measures to thwart a known, substantial risk that a pretrial detainee will attempt suicide. *See Farmer*, 511 U.S. at 847; *Burrell*, 307 F.3d at 7; *Elliot*, 940 F.2d at 10-12; *Martin,* 387 F. Supp. 2d at 76.

For these reasons, Sergeant Winslow, Corporal Woll, and Officers Wood, Heath III, Truppa, and Escorsio are not entitled to qualified immunity.

### B.      Maine Tort Law Claims

#### 1.  Negligence Claims against the County

The Plaintiff concedes that the Maine Tort Claims Act (the "**MTCA**") bars its negligence claims against the Municipal Defendants. Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. 27-28 n.19, ECF No. 92; *see* 14 M.R.S.A. §§ 8100−8118. The Court grants the Defendants' motion for summary judgment with respect to the Plaintiff's state law negligence claims against the Municipal Defendants.

#### 2.  Negligence Claims against Corporal Woll and Officers Stilkey and Heath IV

The Plaintiff concedes that because she failed to provide Corporal Woll and Officers Stilkey and Heath IV with written notice of her state law negligence claims against them within 180 days of their accrual as required by 14 M.R.S.A. § 8109, her claims against those Defendants fail. PRDSMF ¶ 257; Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. at 27-28 n.19.  Therefore, the Court grants the Defendants' motion for summary judgment with respect to the Plaintiff's state law negligence claims against Corporal Woll and Officers Stilkey and Heath IV.

#### 3.  Negligence Claims against Sergeant Winslow and Officers Wood, Heath III, Truppa, and Escorsio

The Plaintiff brings state law negligence claims against Sergeant Winslow, and Officers Wood, Heath III, Truppa, and Escorsio based on their handling of Lalli on October 3, 2009 and October 5, 2009. The Defendants contend that § 8111(1)(C) of the MTCA, which grants employees of governmental entities immunity from suit

for claims arising out of "[p]erforming or failing to perform any discretionary function or duty," bars the Plaintiff's claims. 14 M.R.S.A. § 8111(1)(C).

Section 8111(1)(C) explicitly provides for discretionary immunity to apply "whether or not the discretion is abused." 14 M.R.S.A. §8111(1)(C). However, the Law Court has made clear that the immunity is lost where a defendant's conduct "so clearly exceeds the scope of an employee's authority that the employee cannot have been acting in his official capacity." *Hilderbrand II v. Washington Cnty. Comm'rs*, 33 A.3d 425, 429 (Me. 2011); *see also Bowen v. Dep't of Human Servs.*, 606 A.2d 1051 (Me. 1992) (immunity lost where employee's conduct is "so egregious" that it exceeds scope of employee's discretion as a matter of law). The only disputed issue with respect to § 8111(C) immunity is whether this exception applies.[14]

The Plaintiff argues that it does. In support, she points to *Estate of Hampton v. Androscoggin Cnty.*, 245 F. Supp. 2d 150 (D. Me. 2003) and *Ellis v. Meade*, 887 F. Supp. 324 (D. Me. 1995), two cases which she claims stand for the proposition that the "egregious" action inquiry is "coterminous with the outcome of the deliberate indifference inquiry." Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. 28. She makes no other argument in support of her position.

The citations to *Estate of Hampton* and *Ellis* are unconvincing. Each is a case where this District found that the defendants *had not* acted with deliberate indifference and, predictably, also *had not* "clearly exceed[ed] the scope of [their] authority." *Hilderbrand*, 33 A.3d at 429; *Estate of Hampton*, 245 F. Supp. 2d at 160-

---

[14]    The Plaintiff concedes that the supervision of pretrial detainees is a discretionary function under Maine law. *See Roberts v. State*, 731 A.2d 855, 857-58 (Me. 1999).

61; *Ellis*, 887 F. Supp. at 329-31. The cases do not support the obverse proposition that where a defendant's conduct is deliberately indifferent it is necessarily egregious.

Sergeant Winslow, and Officers Wood, Heath III, Truppa, and Escorsio's conduct may constitute an abuse of their discretion to supervise pretrial detainees, but it is not self-evidently "so egregious that it 'exceeds as a matter of law, the scope of any discretion [they] could have possessed . . . .'" *Bowen v. Dep't of Human Servs.*, 606 A.2d 1051, 1055 (Me. 1992) (quoting *Polley v. Atwell*, 581 A.2d 410, 414 (Me. 1990)). Because Maine law requires us to strictly construe exceptions to § 8111 and the Plaintiff has not supported her position with a cogent legal argument, Sergeant Winslow, and Officers Wood, Heath III, Truppa, and Escorsio are entitled to discretionary immunity under the Maine Tort Claims Act.[15] *See Grossman v. Richards*, 722 A.2d 371, 375 (Me. 1999) (explaining that the Law Court "strictly construe[s] exceptions" to § 8111 of MTCA); *Fortin v. Titcomb*, 671 F.3d 63, 67 (1st Cir. 2012) (explaining that "[t]he Law Court appears to be particularly strict in construing the provisions of the MTCA that govern suits against government employees").

## C.   § 1983 Claims against Municipal Defendants

The Plaintiff puts forward two related theories of municipal liability against the Municipal Defendants. The Plaintiff claims that the Municipal Defendants are

---

[15]   The Defendants offer that, even if § 8111(1)(C) does not apply, the Plaintiff's claims are barred by § 8111(1)(E). This grants government employees absolute immunity for tort claims arising out of "[a]ny intentional act or omission within the course and scope of employment," except for actions taken "in bad faith." 14 M.R.S.A. § 8111(1)(E). Because § 8111(1)(C) applies, the Court does not reach the issue of whether § 8111(1)(E) also bars the Plaintiff's claims.

liable for: (1) failing to adequately train the jail's staff in suicide prevention; and (2) employing insufficient suicide prevention policies, procedures, customs and practices by allowing shift supervisors discretion in determining how suicidal inmates are handled.

Local governments may be held liable under § 1983 if they cause a person to be subjected to a constitutional deprivation. *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011) (citing *Monell v. New York City Dept. of Social Servs*. 436 U.S. 658, 692 (1978)). But they "are responsible only 'for their own illegal acts'" and "are not vicariously liable . . . for their employees' actions." *Id.* (internal citations omitted).

"[A] plaintiff seeking to impose liability on a municipality under § 1983 must identify a municipal 'policy' or a 'custom' that caused the plaintiff's injury." *Silva v. Worden*, 130 F.3d 26, 30-31 (1st Cir. 1997) *(*citing *Board of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 403 (1997), *Pembaur v. Cincinnati,* 475 U.S. 469, 479-81 (1986) and *Monell,* 436 U.S. at 694)). "The disputed 'policy' or 'custom' must also be the cause and moving force behind the deprivation of constitutional rights." *Silva*, 130 F.3d at 31 (citing *Bryan Cnty. Comm'rs,* 520 U.S. at 404).

The term "policy" encompasses "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the governmental] body's officers." *Monell*, 436 U.S. at 690. As the Supreme Court noted in *Monell*:

> although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a [constitutional] deprivation . . . local governments . . . by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom

> has not received formal approval through the body's official decisionmaking channels.

436 U.S. at 690-91. Municipal liability for a "custom" attaches when "the relevant practice is so widespread as to have the force of law." *Bryan Cnty. Comm'rs,* 520 U.S. at 404;[16] *see also Silva*, 130 F.3d at 31 ("[O]ne method of showing custom is to demonstrate that the custom or practice is so 'well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.'" (quoting *Bordanaro v. McLeod,* 871 F.2d 1151, 1156 (1st Cir.1989)).

### 1. Failure to Train Jail Personnel in Suicide Prevention

The Plaintiff's failure to train claim is a species of the general claim that the Municipal Defendants' inadequate policies, procedures, customs and practices caused Lalli's injuries. *See Connick*, 131 S. Ct. at 1359-60. The Supreme Court has recently cautioned that municipal liability is "at its most tenuous" where failure-to-train claims are concerned. *Connick*, 131 S.Ct. at 1359.

For this claim to succeed, the Plaintiff must establish that the "municipality's failure to train its employees in a relevant respect . . . amount[s] to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Connick*, 131 S.Ct. at 1359 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)). Deliberate indifference requires the municipal actor to "disregard[ ] a known or obvious consequence of his action," so liability only arises

---

[16]    *Connick* reformulates this ever so slightly, eliding § 1983's reference to "custom or usage" and in essence making "practices" that are "so persistent and widespread as to practically have the force of law" a species of the "official policy" that may support liability. *Connick*, 131 S. Ct. at 1359.

when municipal "policymakers are on actual or constructive notice that a particular omission in their training program causes . . . employees to violate citizens' constitutional rights." *Id.* (internal citations omitted.)

In all but a narrow range of instances, deliberate indifference in a failure to train claim is established by evidence that shows "a pattern of similar constitutional violations by untrained employees." *Id.* at 1360-61. A single constitutional violation supports a claim for failure to train only where the violation of constitutional rights is a "highly predictable consequence" of the failure to train. *Id.* at 1361 (quoting *Bryan County Comm'rs,* 520 U.S. at 409); s*ee also Canton*, 489 U.S. at 390, n. 10. The Supreme Court provided the following illustration:

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be "so obvious" that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*Canton*, 489 U.S. at 390 n. 10.

The Plaintiff faces three obstacles in her failure to train claim: (a) the jail's staff had actually been trained in suicide prevention; (b) the record does not reveal a pattern of similar constitutional violations; and (c) the evidence of causation is slim.

### a.  Training in Suicide Prevention

The jail has admittedly not kept up with its policy of providing annual suicide prevention training to its staff. Nevertheless, all of the individual defendants had at least some training in suicide prevention, both from basic corrections courses and

from suicide prevention trainings at the jail. Officer Escorsio was trained three times in five years; Officer Heath III was trained twice in 14 years and was also an instructor in suicide prevention training; Officer Truppa was trained seven times in 21 years; Sergeant Winslow was trained seven times in 11 years; Corporal Woll was trained three times in three years; and Officer Wood was trained five times in 19 years.

The Plaintiff's expert contends that "it is well known that one of the keys to proper training is repetition," and that the jail's failure to complete annual trainings resulted in the failure of jail personnel to retain valuable suicide-prevention information. Aff. of Linsday M. Hayes ¶¶ 38-39, ECF No. 92-1 ("**Hayes Aff.**").[17] He opines that suicide prevention training would have reminded jail personnel, for example, that an inmate intent on suicide can hang himself in three to five minutes, making a fifteen-minute watch ineffective for those at high risk of suicide. Hayes Aff. ¶ 40. Even accepting the Plaintiff's argument that suicide prevention training is not "proper" if it is not repeated every year, the Plaintiff does not dispute that the jail provided some training.

The two cases that are most applicable to the Plaintiff's situation, *Canton* and *Young v. City of Providence*, were cases in which the plaintiffs essentially alleged that the municipal defendants offered no training. *See Canton*, 489 U.S. at 381-82, *Young v. City of Providence ex. rel. Napolitano,* 404 F.3d 4, 17, 27-28 (1st

---

[17]     The Plaintiff did not incorporate her expert's affidavit into her statements of fact, in violation of Local Rule of Civil Procedure 56. By referring to the affidavit the Court does not condone this practice. The Plaintiff needlessly imperiled her position on summary judgment by failing to set forth the affidavit's contents within her statements of fact. Because the Court finds no municipal liability, the Defendant is not prejudiced by the Court's reference to the affidavit.

Cir. 2005). In *Canton*, the plaintiff, an arrestee who collapsed during transport to the jail and again at the jail, was provided with no medical attention. *Canton*, 489 U.S. at 381-82. Canton provided evidence that, although shift commanders at the city's police stations "were authorized to determine, in their sole discretion, whether a detainee required medical care . . . [they] were not provided with any special training (beyond first-aid training) to make a determination as to when to summon medical care for an injured detainee." *Id*. This was sufficient for the Supreme Court to determine that there might be grounds on which the plaintiff could prevail against the city. *Id.* at 392.

In *Young*, the plaintiff's son, a Providence, Rhode Island police officer, was fatally shot by two on-duty police officers when he responded as an off-duty officer to an emergency situation per the city's "always armed/always on duty" policy. *Young*, 404 F.3d at 9. Young provided evidence that, despite its policy, the city provided no training in off-duty/on-duty misidentifications. *Young*, 404 F.3d at 17 and 27-28. This was sufficient for the First Circuit to reverse a grant of summary judgment in the city's favor. *Id.* at 29. But the First Circuit in *Young* also stated that "a training program must be quite deficient in order for the deliberate indifference standard to be met: the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing." *Id.* at 27.

It is doubtful that any plaintiff can survive summary judgment on a claim for failure to train where the individual defendants did receive the specific training at issue, and it is merely the frequency of the training that is at issue.

### b.  Pattern of Similar Constitutional Violations

The Plaintiff points first to a 2001 performance evaluation of Lieutenant Carver, which references the death of an inmate and implicitly criticizes her for a "lack of timely suicide prevention training for staff." Pl.'s Exh. X, ECF No. 93-25. Taking all inferences in favor of the Plaintiff, this indicates that an inmate at the jail committed suicide sometime around 2001, and that this may have been a result of jail staff not receiving suicide prevention training. Indeed, the jail undertook no suicide prevention trainings between October of 1995 and June of 2001.

Next, the Plaintiff points to the fact that there were 26 other "incidents of suicidal behavior"[18] between January of 2007 and October 5, 2009, when Lalli attempted suicide. This number seems startlingly high for a modest-sized jail,[19] and might, if contextualized, give rise to questions regarding the efficacy of the jail's suicide prevention program. But without further information, it is not possible to determine whether any of these incidents may be considered constitutional violations similar to the one alleged in this case.

---

[18]    This denomination is lifted from the jail's own spreadsheet, titled "Incidents of Suicidal Behavior" and listing the dates and brief descriptions of incidents at the Jail from 2007-2011. *See* Stevens Decl. ¶ 39, ECF No. 93-1; Pl.'s Exh. KK, ECF No. 94-10) (the spreadsheet.) The descriptions of the "method" are all one or two words, and include "strangulation," "cutting," "hanging," "materials," "head banging," "stabbing," and "poison." It is unclear whether, by labeling the listed events "incidents of suicidal behavior" the Jail intended to admit that each incident could be considered an attempt at suicide or whether it was simply taking a broad view of all incidents of self-harm and crediting them as possible suicide attempts.

[19]    At the time of Lalli's detention in 2009, the jail housed between 70 and 74 inmates.

For a suicide attempt to undergird a constitutional violation there must have been unconstitutional conditions. Unlike the 2001 incident, the record contains no facts that would support a conclusion that these events were a product of unconstitutional conditions at the jail. The Plaintiff has not identified which officers were on duty, nor what level of training they had at the time of the incidents. There is also no evidence to suggest that the jail failed to conduct suicide screening of any of these inmates prior to these incidents, or that jail personnel ignored signs of suicidal distress. Nor do we know the outcome of any of these events. Lacking any concrete situational facts, it would be mere speculation to conclude that deliberate indifference caused any of the 2007-2009 incidents. In sum, the Plaintiff has identified one possible prior similar constitutional violation, but not a pattern of prior similar constitutional violations.

### c. Causation

Because the Plaintiff has not demonstrated a pattern of prior similar constitutional violations, she may defeat summary judgment only by producing facts establishing that Lalli's injuries were a "highly predictable consequence" of the Municipal Defendants' failure to train. *See Connick*, 131 S.Ct. at 1361.

The Municipal Defendants must have been aware that suicide was a grave risk among the jail's population, given the 26 incidents of suicidal behavior between 2007 and 2009. Accordingly, they had a duty to provide suicide prevention training to the jail's staff. This, they did. The Plaintiff thus bears the burden of showing that the training that was provided was so deficient that it was highly predictable that

suicides would result. *See Connick*, 131 S.Ct. at 1361. Between January 1989 and October 5, 2009, the jail provided 18 trainings, on average somewhat less than one per year. At its worst, between October 1995 and June 2001, the jail skipped trainings for a period of nearly six years. The jail also did not mandate that all of its staff attend each training provided. For example, Officer Heath III managed to receive only two trainings in 14 years, and Officer Wood received only five trainings in 19 years. While this record suggests some negligence on the Municipal Defendants' part, a jury would have to speculate to conclude that it establishes deliberate indifference. Other than offer an expert who opines that repetition of training is key, the Plaintiff has provided no evidence that quantifies the effect this level of training would have had on the jail staff's ability to effectively respond to suicidal detainees. On these facts alone, no rational jury could conclude that the Municipal Defendants were deliberately indifferent.

### 2. Inadequate Policies, Procedures, Customs and Practices Regarding Suicide Prevention

The Plaintiff's second municipal liability claim targets the jail's admission that shift supervisors are allowed to take any action they deem appropriate regarding inmates who are identified as being at risk of suicide. The Plaintiff has put forward evidence from which a fact-finder could conclude that the risk that Lalli would harm himself was glaringly obvious by any reasonable measure. Under such circumstances, the Plaintiff claims, a jail cannot constitutionally have a practice of allowing its shift supervisors to exercise their judgment regarding whether to place the inmate on a suicide watch. It is unclear whether this can in fact stand alone as

a claim,[20] but the Plaintiff has argued it on its own merits, so the Court analyzes it as such.

The Constitution requires that the jail house its inmates in conditions that do not put them at substantial risk of serious harm. The Plaintiff's expert opines that, because corrections officers are not mental health professionals, the jail can fulfill its constitutional mandate only by requiring them to follow "strict instructions" regarding their response to an inmate presenting a high risk of suicide. Hayes Aff. ¶ 54. For instance, he testifies, an explicit protocol should have directed the jail personnel handling Lalli's case to employ "effective suicide prevention techniques, such as . . . a suicide smock, using continuous observation, removing items of self-harm and obtaining the services of a mental health provider." Hayes Aff. ¶ 54.

This claim faces three hurdles. First, the Plaintiff must identify a municipal policy or custom. 42 U.S.C. §1983. Second, the Plaintiff must demonstrate a prima facie case that "the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Bryan County Comm'rs,* 520 U.S. at 407. Finally, the Plaintiff must adduce sufficient facts for a fact-finder to conclude that the policy was the "moving force behind the injury of which the plaintiff complains." *Id.* at 405.

---

[20]    In *Canton*, the plaintiff argued that police station "shift commanders were authorized to determine, in their sole discretion, whether a detainee required medical care," but were provided with no special training to make that determination. *Canton*, 489 U.S. at 381-82. The Supreme Court treated these premises together as a failure to train case, implying that the policy of allowing shift commanders discretion might be unconstitutional only if the commanders lacked training that would enable them to properly exercise their discretion. *See id.* at 388-912.

### a.  Policy, Custom, or Practice

The jail admits that, at the time of Lalli's injury, it did not require its shift supervisors to take any particular action with respect to inmates at risk of suicide. DRPSAMF ¶¶ 295-296. But the Plaintiff does not identify whether this discretion is the result of a decision made by any policymaking officials or whether instead it is merely a convention at the jail. The Defendants assert that this is really a "custom or practice" claim, in which case, the custom or practice must be so "persistent and widespread" that it may be regarded as a policy. *See Connick*, 131 S.Ct. at 1359.

The Plaintiff has not presented evidence specifically aimed at demonstrating that the jail's practice of allowing its shift commanders discretion was long-standing or that it was so widespread that it could be regarded as a "policy" or a "custom" under Section 1983. *See Connick*, 131 S.Ct. at 1359; *Bryan County Comm'rs,* 520 U.S. at 404; *Silva*, 130 F.3d at 31; *Bordanaro,* 871 F.2d at 1156. But at the same time, there seemed to be no confusion among the jail's staff about the shift supervisor's discretion to determine the fate of at-risk inmates. For example, Officer Stilkey was well aware that, though she performed Lalli's intake, Sergeant Winslow was responsible for completing the part of the Suicide Risk Assessment that determined what level of intervention Lalli should receive. Taking all inferences in favor of the Plaintiff, a reasonable fact-finder could conclude that everyone at the jail understood that shift supervisors were to determine the treatment of at-risk detainees and that it had been the jail's practice for some time to afford them this discretion.

### b. Deliberate Indifference to Known or Obvious Consequences

In order for liability to ensue, the jail's practice of leaving discretion to shift supervisors must have been undertaken with deliberate indifference as to its known or obvious consequences. *Bryan County Comm'rs,* 520 U.S. at 407. The Plaintiff's claim of deliberate indifference rests on her argument that shift supervisors, who are not trained mental health care professionals, should not be left with discretion in how to handle suicidal inmates. But to the extent Sergeant Winslow and Corporal Woll were trained in suicide prevention, the Municipal Defendants cannot be deliberately indifferent for leaving discretion in their hands.

Sergeant Winslow was the shift supervisor during Lalli's intake on October 3, 2009. Since 1999, he had received suicide prevention training seven times, and his three most recent trainings were in September 2005, November 2006, and December 2007. Though Sergeant Winslow skipped a training in 2008, his most recent trainings were fairly close to the requirements for training endorsed by the Plaintiff's expert.

Corporal Woll was the shift supervisor when Lalli was readmitted to the jail on October 5, 2009. He was a fairly recent graduate of the corrections course, which he completed in 2007 and which included suicide prevention training, and he received two additional suicide prevention trainings in November 2006 and December 2007. Like Sergeant Winslow, the number and timing of Corporal Woll's trainings were not so infrequent the Municipal Defendants could be found deliberately indifferent for leaving discretion in his hands.

72

### c.  Moving Force

The Plaintiff also failed to demonstrate that the Municipal Defendants' policy of leaving discretion in the hands of shift supervisors might be the "moving force" behind Lalli's injuries. To be sure, the Plaintiff can make a claim to but-for causation: had Winslow and Woll not been given discretion, Lalli would have been immediately assigned to suicide watch and this would have prevented his injuries. But, unlike cases involving a municipal policy that directly violates constitutional rights, the practice of allowing shift supervisors discretion in how to handle suicidal inmates does not in itself promote constitutional violations. *Cf. Haley v. City of Boston*, 657 F.3d 39, 52 (1st Cir. 2011) (alleged police department policy of withholding helpful evidence from criminal defendants); *Bordanaro*, 871 F.2d at 1156 (alleged longstanding, widespread police practice of breaking down doors without a warrant when arresting a felon).

At most, it represents a failure to interpose an additional procedural safeguard. In a case where the government acknowledges the risk of inmate suicide and puts in place some procedures to combat the risk, including inmate screening and employee training, merely providing shift supervisors discretion fails to rise to the level of causation required for municipal liability. *See Bryan County Comm'rs,* 520 U.S. at 405 (requiring the custom, policy, or practice to be the "moving force" behind the injury); *Canton*, 489 U.S. at 391 (requiring the deficiency to be "closely related to the ultimate injury").

## CONCLUSION

For the above-stated reasons, the Defendants' motion for summary judgment is **GRANTED** regarding Counts I and IV[21] as to Defendants Knox County, Knox County Jail, Knox County Sheriff's Department, John Hinkley, Kathy Carver, and Donna Dennison, regarding Counts II and IV as to Defendants Warren Heath IV and Julie Stilkey, and regarding Count III as to all the Defendants, but **DENIED** regarding Counts II and IV[22] as to Defendants Angela Escorsio, Warren Heath III, Christopher Truppa, Dane Winslow, Bradley Woll, and Robert Wood.


SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 30th day of September, 2013.

---

[21]     As to Defendants for whom no underlying claim for liability remains, the Court grants summary judgment on the punitive damages claim stated in Count IV.

[22]     As to Defendants for whom an underlying claim for liability remains, the punitive damages claim stated in Count IV remains alive. *See Smith v. Wade*, 461 U.S. 30, 56 (1983) (punitive damages available under § 1983 where the defendant's conduct was "motivated by evil motive or intent" or "involves reckless or callous indifference to the federally protected rights of others").